**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Paul A. BILZERIAN, Defendant.**

**No. CIV. A. 89–1854 SSH.**

United States District Court, District of Columbia.

Aug. 21, 2000.

Judith Roxanne Starr, Securities & Exchange Commission, Division of Enforcement, Washington, DC, for Plaintiff.

Paul A. Bilzerian (Pro Se), Tampa, FL.

## OPINION

STANLEY S. HARRIS, District Judge.

This matter now is before the Court on plaintiff Securities and Exchange Commission's ("SEC") application for an order holding defendant Paul A. Bilzerian in contempt of the Court's January 28, 1993, and June 25, 1993, disgorgement orders. The SEC also seeks an order holding Bilzerian in contempt of the Court's November 20, 1998, order directing Bilzerian to file an accounting of his assets. The Court held a hearing on the SEC's application for civil contempt on March 5, 1999. The Court also held a telephone conference with the parties on April 19, 1999, at which a court reporter was present. In addition, the parties have submitted numerous memoranda in support of and in opposition to the SEC's application (detailed below). After considering the arguments made and evidence presented by the SEC and Bilzerian (appearing *pro se* ), as well as the entire record herein, the Court finds Bilzerian in contempt of its 1993 disgorgement orders and orders him to purge his contempt as set forth in the accompanying Order. The Court declines now to find Bilzerian in contempt of its order for an accounting, but orders him to file another, more detailed accounting. Also before the Court are Bilzerian's motion to strike and re-

quest for oral argument, and the SEC's opposition thereto. Upon consideration of these submissions, as well as the entire record herein, the Court denies Bilzerian's motion to strike and request for oral argument. The Court's reasons for these decisions follow.

## PROCEDURAL BACKGROUND

This is the latest phase of a long history of litigation involving Bilzerian and the SEC, both in this Court and elsewhere. The Court provides a summary of this litigation.

### A. Criminal Conviction in the Southern District of New York

Bilzerian was convicted of securities fraud and conspiracy to defraud the United States on September 27, 1989, in the United States District Court for the Southern District of New York. The Second Circuit affirmed his criminal conviction. *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir.1991), and the Supreme Court denied his petition for a writ of certiorari. *Bilzerian v. United States*, 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991). He was sentenced to four years imprisonment and a $1.5 million fine. Bilzerian paid the fine, and the district court later reduced his sentence to twenty months. In addition to his direct appeal, Bilzerian moved to vacate and set aside his conviction pursuant to 28 U.S.C. § 2255. The district court denied that motion, the Second Circuit affirmed, and the Supreme Court denied his petition for a writ of certiorari. *Bilzerian v. United States*, 1996 WL 524340 (S.D.N.Y.); *Bilzerian v. United States*, 127 F.3d 237 (2d Cir.1997); *Bilzerian v. United States*, 527 U.S. 1021, 119 S.Ct. 2365, 144 L.Ed.2d 770 (1999).

### B. Civil Liability in this Court

After Bilzerian's criminal conviction in New York, the SEC filed this civil suit against him on June 29, 1989. Based on the collateral estoppel effect of his criminal conviction for securities fraud, the Court granted the SEC's motion for partial summary judgment, found Bilzerian liable for securities fraud, and imposed permanent injunctions against any further securities law violations by him. *SEC v. Bilzerian*, 1991 WL 83964 (D.D.C.1991). The Court of Appeals affirmed the Court's decision. *SEC v. Bilzerian*, 29 F.3d 689 (D.C.Cir. 1994). His untimely petition for a writ of certiorari was not accepted for filing. *Bilzerian v. SEC*, 514 U.S. 1011, 115 S.Ct. 1350, 131 L.Ed.2d 210 (1995). *See also Bilzerian v. SEC*, 514 U.S. 1094, 115 S.Ct. 1820, 131 L.Ed.2d 742 (1995) (denying motion for reconsideration).

In connection with his civil liability for securities fraud, the Court ordered Bilzerian to disgorge $33,140,787.07, his profit from the fraud, on January 28, 1993. *SEC v. Bilzerian*, 814 F.Supp. 116 (D.D.C.1993). On June 25, 1993, the Court ordered Bilzerian to disgorge an additional $29,196,812.46 in prejudgment interest. *SEC v. Bilzerian*, 1993 WL 542584 (D.D.C.). The Court of Appeals affirmed the disgorgement orders. *Bilzerian*, 29 F.3d at 696. Bilzerian readily admits that he has yet to pay one penny of the more than $62 million judgment.[1] However, the SEC did not seek to enforce this judgment for more than five years, due to protracted litigation over the dischargeability of the judgment in a bankruptcy proceeding.

### C. Bankruptcy Petition in the Middle District of Florida

On April 6, 1991, two days before the Court's grant of partial summary judgment against him, Bilzerian filed for bankruptcy in the Middle District of Florida.[2]

---

1. A newspaper article stated that he is the fourth biggest non-payer of SEC penalties to date. Michael Schroeder, *SEC Collects Only Half Its Financial Penalties*, Wall St. J. (Aug. 26, 1998).

2. Apparently, he filed the petition in response to a $26 million judgment entered against him on April 2, 1991, in connection with an unrelated matter in Texas.

During the pendency of the bankruptcy proceeding, Bilzerian claimed that this Court's disgorgement judgment was dischargeable in bankruptcy, while the SEC argued that it was not. On September 9, 1998, after several years of litigation, the Eleventh Circuit affirmed the Florida district court's decision that the disgorgement judgment was not dischargeable in bankruptcy. *In re Bilzerian*, 153 F.3d 1278 (11th Cir.1998). Bilzerian then sought rehearing *en banc* and also filed suit against the SEC in the Middle District of Florida seeking to set aside the decision on the ground that it was obtained as a result of the SEC's fraud on the court. *Bilzerian v. SEC*, No. 98–CV–2563 (M.D.Fla.). On December 14, 1998, the Eleventh Circuit denied Bilzerian's petition for rehearing *en banc*. *In re Bilzerian*, 166 F.3d 355 (11th Cir.1998). On March 16, 1999, the Florida district court granted the SEC's motion to dismiss Bilzerian's fraud case against it. (Pl.'s Response to Def.'s Suppl. Opp'n Ex. 2.) On January 24, 2000, the Eleventh Circuit affirmed the district court's dismissal of Bilzerian's fraud case. *Bilzerian v. SEC*, 208 F.3d 1011 (11th Cir.2000). On April 11, 2000, the Eleventh Circuit denied Bilzerian's petition for rehearing *en banc*.[3] 213 F.3d 650 (11th Cir.2000)

## D. The SEC's Application To Hold Bilzerian in Civil Contempt of this Court's 1993 Orders

After the Eleventh Circuit's decision, the SEC applied to this Court on November 12, 1998, seeking to hold Bilzerian in civil contempt of the 1993 disgorgement orders. On November 20, 1998, the Court issued a show cause order that set a briefing schedule, ordered Bilzerian to file a sworn accounting identifying all assets in which he had any direct or indirect beneficial interest, and set a hearing date for January 6, 1999. Bilzerian filed an opposition to the SEC's motion on December 23, 1998, and the SEC filed its reply on December 29, 1998. Because Bilzerian suffered a skiing injury shortly before the hearing, the Court granted Bilzerian's January 4, 1999, motion to continue the hearing to a later date. Over the SEC's opposition, the Court rescheduled the hearing for March 5, 1999.[4] Because Bilzerian had not yet filed the ordered accounting, the Court again ordered him to file it. Bilzerian filed his purported accounting on February 26, 1999. At the March 5 hearing, at Bilzerian's request, the Court granted him another opportunity to respond to the SEC's motion. Accordingly, he submitted a supplemental memorandum in opposition to the SEC's motion for a contempt order on March 19, 1999, to which the SEC filed a response. The Court held a telephone conference with the parties on April 19, 1999, during which the Court granted Bilzerian yet another opportunity to respond to the SEC's motion. On May 3, 1999, Bilzerian submitted a second supplemental memorandum in opposition to the SEC's motion, to which the SEC filed a response as well as two supplemental declarations. Finally, on May 25, 1999, Bilzerian filed a motion to strike certain paragraphs of the SEC's supplemental declarations as well as a request for another hearing, to which the SEC filed an opposition.

---

**3.** Per Bilzerian's request, the Court takes judicial notice of the briefs and petition for rehearing filed with the United States Court of Appeals for the Eleventh Circuit. *See* FRE 201(d). The Court notes that, until such time as the district court's decision is reversed, Bilzerian obtains the relief he sought in the dismissed complaint, and the disgorgement judgment is redetermined, these filings do not affect the Court's analysis of whether he should be held in contempt of this Court's disgorgement judgment. *See D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 459 (7th Cir.

1993) (noting that a contempt proceeding is "concerned solely with whether or not the respondent's conduct violates a prior court order.")

**4.** The SEC opposed any continuance longer than two weeks, as it understandably was concerned that a long continuance would give Bilzerian the opportunity to take further steps to frustrate the relief sought in its motion. (Pl.'s Opp'n to Def.'s Mot. for a Continuance at 1.)

## CIVIL CONTEMPT STANDARDS

The Court has both an inherent and a statutory power to enforce compliance with its orders through the remedy of civil contempt. *See Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); *Petties v. District of Columbia*, 897 F.Supp. 626, 629 (D.D.C. 1995); *SEC v. Current Fin. Servs., Inc.*, 798 F.Supp. 802, 806 (D.D.C.1992); 18 U.S.C. § 401. A civil contempt proceeding generally involves three stages: (1) the court issues an order; (2) after the party disobeys the order, the court issues a conditional order finding the recalcitrant party in contempt and threatening to impose a specified penalty unless the recalcitrant party purges itself of contempt by complying with prescribed purgation conditions; and (3) if the party does not fulfill the purgation conditions, the court exacts the threatened penalty. *See NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173, 1184 (D.C.Cir. 1981); *SEC v. Parkersburg Wireless, L.L.C.*, 156 F.R.D. 529 (D.D.C.1994); *Current Fin. Servs.*, 798 F.Supp. at 806. This matter is currently at the second stage; the SEC seeks an order finding Bilzerian in civil contempt of the Court's 1993 disgorgement orders and directing him to comply with certain conditions in order to purge the contempt.

A party is in contempt of court when he "violates a definite and specific court order requiring him to perform or refrain from performing a particular act or acts with knowledge of that order." *SEC v. Bankers Alliance Corp.*, 881 F.Supp. 673, 678 (D.D.C.1995) (quoting *Whitfield v. Pennington*, 832 F.2d 909, 913 (5th Cir. 1987)). As the party seeking a finding of contempt, the SEC bears the initial burden of showing, by clear and convincing evidence, that (1) court orders were in effect, (2) the orders required certain conduct by Bilzerian, and (3) Bilzerian failed to comply with the Court's orders. *See Bankers Alliance Corp.*, 881 F.Supp. at 678. Bilzerian's intent is irrelevant; the Court need not find that his failure to comply with the orders was willful or intentional. *See Blevins Popcorn Co.*, 659 F.2d at 1184; *Petties*, 897 F.Supp. at 629; *Current Fin. Servs.*, 798 F.Supp. at 806.

Once the SEC has made a prima facie showing that Bilzerian did not comply with the Court's orders, the burden shifts to Bilzerian to produce evidence justifying his noncompliance. *See Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir.1998). Bilzerian may defend against a finding of contempt on the ground that he is unable to comply with the orders.[5] *See United States v. Rylander*, 460 U.S. 752, 757, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983); *SEC v. Ormont Drug & Chem. Co.*, 739 F.2d 654, 656 (D.C.Cir.1984); *Bankers Alliance Corp.*, 881 F.Supp. at 678. Notably, Bilzerian bears the burden of production on such a defense. *See Rylander*, 460 U.S. at 757, 103 S.Ct. 1548; *Ormont Drug & Chem. Co.*, 739 F.2d at 657 n. 7; *Bankers Alliance Corp.*, 881 F.Supp. at 683. A mere claim of poverty—wholly unrealistic on its face here—without adequate proof is not sufficient to satisfy his burden. *Loftus v. Southeastern Pa. Trans. Auth.*, 8 F.Supp.2d 464, 467 (E.D.Pa.1998). *See also SEC v. Kenton Capital, Ltd.*, 983 F.Supp. 13, 15 (D.D.C.1997) (finding party's "bald and conclusory statements in his affidavit," without more, were not sufficient evidence of his inability to comply with the court's disgorgement order). Bilzerian must substantiate his inability to comply with the Court's orders "categorically and in detail." *Current Fin. Servs.*, 798 F.Supp. at 808. *See also Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir.1995) (stating that it is the alleged contemnor's burden to establish his inability to comply "clearly, plainly, and unmis-

---

5. A party also may defend on the ground of good faith substantial compliance with the orders, *see Food Lion, Inc. v. United Food & Commercial Workers Int'l Union*, 103 F.3d 1007, 1016 (D.C.Cir.1997); *Cobell v. Babbitt*, 37 F.Supp.2d 6, 9–10 (D.D.C.1999); however, Bilzerian's opposition focuses solely on his alleged inability to comply with the orders.

takably."). Further, a party seeking to establish an impossibility defense to a charge of contempt should "show[ ] that he has made in 'good faith all reasonable efforts to comply.'" *Chairs*, 143 F.3d at 1436 (quoting *United States v. Ryan*, 402 U.S. 530, 534, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971)). *See Kenton Capital, Ltd.*, 983 F.Supp. at 16 (noting that alleged contemnor had burden of proving that "he has made reasonable efforts to meet his obligations to the court."). *Cf. Natural Resources Defense Council, Inc. v. Train*, 510 F.2d 692, 713 (noting that a court may choose not to hold a party in contempt if "he has in good faith employed the utmost diligence in discharging his ... responsibilities."). Thus, to the extent Bilzerian's claimed inability to comply has been self-created, it is not a defense to a finding of contempt. *See In re Power Recovery Sys., Inc.*, 950 F.2d 798, 803 (1st Cir.1991) (noting that a self-induced inability to comply does not establish an inability defense); *Pesaplastic, C.A. v. Cincinnati Milacron Co.*, 799 F.2d 1510, 1521 (11th Cir.1986) ("[W]here the person charged with contempt is responsible for the inability to comply, impossibility is not a defense to the contempt proceedings."). *See also Ormont Drug & Chem. Co.*, 739 F.2d at 657 (noting that the court must consider the defendant's inability to comply, but only to the extent it was without fault on the defendant's part). Finally, Bilzerian cannot avoid a finding of contempt merely by showing that he is unable to pay the entire $62 million judgment at this time. Inability to comply is only a complete defense if he cannot pay any of the judgment; otherwise, he must pay what he can. *See SEC v. Musella*, 818 F.Supp. 600, 602 (S.D.N.Y.

1993). *See also Loftus*, 8 F.Supp.2d at 468 ("[U]nless a party is completely unable to comply with the Court's Order's [*sic*] due to poverty, he must comply to the extent that his finances allow him.").

## DISCUSSION

### I. Whether Bilzerian is in Contempt of the Court's 1993 Disgorgement Orders

■ Bilzerian readily acknowledges that he has not paid any of the approximately $62 million the Court ordered him to disgorge in its 1993 orders. Thus, the SEC has easily met its initial burden of demonstrating Bilzerian's failure to comply with the Court's disgorgement orders by clear and convincing evidence. However, Bilzerian claims to have no assets with which to pay the disgorgement judgment and therefore defends against a finding of contempt on the ground that he is presently unable to comply with the Court's orders.[6] The SEC argues that Bilzerian has failed to adequately demonstrate his inability to comply with the Court's judgment, that he does have the financial ability to pay at least part of it, and that, to the extent he cannot comply, it is the result of his own self-induced inability. The Court's review of the evidence and arguments presented by the parties leads it to the unmistakable conclusion that Bilzerian has not established his defense of financial inability and should be found in contempt of this Court.

### A. Evidence of Bilzerian's Financial Status

Bilzerian maintains that he has no meaningful assets with which to pay the

6. While not included in the Argument section of his opposition, Bilzerian devotes much of the "Introduction" to rearguing issues already decided by this and other courts. For example, Bilzerian claims that his New York criminal conviction was erroneous, that this Court's grant of summary judgment and disgorgement orders were inappropriate, and that the Florida district court should have held that the disgorgement judgment was discharged by his bankruptcy. Courts of appeals in the Second, District of Columbia, and Eleventh Circuits, respectively, have rejected these arguments and Bilzerian may not reargue them in the context of this civil contempt proceeding. A civil contempt proceeding is not a retrial of the original controversy and does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed. *Rylander.* 460 U.S. at 756, 103 S.Ct. 1548 (quoting *Maggio v. Zeitz*, 333 U.S. 56, 69, 68 S.Ct. 401, 92 L.Ed. 476 (1948)).

judgment, claiming that all of his assets were lost, disgorged, or transferred long ago. (Def.'s Opp'n at 25.) However, the SEC has provided the Court with substantial, documented evidence of assets which belie his claim of "poverty." Bilzerian has transferred his substantial assets into a complex ownership structure of off-shore trusts and family-owned companies and partnerships. The following is a description of these assets and entities and Bilzerian's relationship to them. Most, if not all, of this evidence is not disputed by Bilzerian.[7] In fact, Bilzerian provided much of the evidence himself. Bilzerian essentially disputes only the conclusion the SEC draws from this evidence—that Bilzerian is able to pay at least part of the disgorgement judgment.

1. *The Paul A. Bilzerian and Terri L. Steffan 1995 Revocable Trust ("Family Trust")*

The Family Trust is a revocable trust located in the Cook Islands that was established in 1995 by Bilzerian and his wife, Terri Steffan. (Def.'s Suppl. Opp'n Ex. 12; Starr Decl. Ex. 15.) Bilzerian was a settlor of the Trust and, at the time the Court issued its order to show cause on November 20, 1998, he was both a trustee and a beneficiary of the Trust as well. (Starr Third Suppl. Decl. Ex. 2.) Bilzerian was removed as trustee on either December 5, 1998, or November 29, 1998.[8] (*Id.*, Def.'s Mot. To Strike Ex. 3.) He was removed as a beneficiary on December 21, 1998. (Starr Third Suppl. Decl. Ex. 2.; Def.'s Suppl. Opp'n Ex. 12; Terri Steffan Decl. ¶ 3; Hodges Decl. ¶ 3.) The current

trustees are Bilzerian's mother- and father-in-law and the current Trust protector is Bilzerian's sister-in-law. (Starr Third Suppl. Decl. Ex. 2; Harry Steffan Decl. ¶ 2; Terri Steffan Decl. ¶ 3; Hodges Decl. n 3.; Def.'s Mot. To Strike Exs. 2, 3.) Apparently, Bilzerian's wife is the Family Trust's sole current beneficiary. (Def.'s Suppl. Opp'n Ex. 12; Starr Second Suppl. Decl. Ex. 2 at 9 n. 1.) According to Bilzerian's wife, her husband "did not contribute any property or assets to the Family Trust that he individually owned." (Def.'s Mot. To Strike Ex. 2.)

The Family Trust is at the apex of the complex ownership structure into which Bilzerian has transferred his assets. The Family Trust directly or indirectly holds every other asset or entity documented by the SEC, with one exception: the Paul A. Bilzerian and Terri L. Steffan 1994 Irrevocable Trust, a trust set up for the benefit of Bilzerian's children. The Family Trust owns 100% of the shares of Overseas Holding Company, owns 100% of the shares of Bicoastal Holding Company, and is the sole limited partner of Overseas Holdings Limited Partnership. (Harry Steffan Decl. ¶¶ 4, 6–8.) As described in more detail below, these three entities either directly or indirectly own the following assets: (1) the Bilzerian family home, valued at approximately $3.5 million; (2) approximately $407,000 in proceeds from the sale of another house located in Tampa, Florida; (3) a Minnesota vacation home valued at $792,500; (4) 3,080,000 shares of common stock in Cimetrix, Inc., valued at approximately $10,010,000;[9] and (5) con-

---

7. The overwhelming majority of this evidence is documented by public records, such as property records and Bilzerian's public filings with the SEC.

8. A Cimetrix Schedule 13D signed by Bilzerian states that he was removed as trustee on December 5, 1998 (*see* Starr Third Suppl. Decl. Ex. 2); however, Bilzerian has submitted a letter from the trust protector dated November 29, 1998, removing him and his wife as trustees on that date. (*See* Def.'s Mot. To Strike Ex. 3.)

9. According to a Schedule 13D filed with the SEC on January 8, 1999, the Trust beneficially owns 3,080,000 shares. (Def.'s Suppl. Opp'n Ex. 12.) The Court calculated the shares' value according to the closing sale price of Cimetrix, Inc., stock on July 24, 2000: $3.25. *See* Yahoo! Finance, *OTC BB Historical Quotes: CMXX.OB* <http://chart.yahoo.com/d?s=cmxx.ob>. The Court notes that the value of Cimetrix shares has fluctuated considerably over the past four years from a high in June 1996 of $9.50 to a low in

tracts with Cimetrix, Inc., for Bilzerian's services, valued at approximately $500,000. In sum, these assets add up to approximately $15.2 million.

Bilzerian does not dispute that the Family Trust owns the listed assets, that he was a settlor of the Trust, and that he was also, until very recently, both a trustee and beneficiary of the Trust.[10] He simply claims that he presently is not a beneficiary or trustee of the Trust. (Def.'s Opp'n at 4–5.) As evidence of his lack of a beneficial interest in or control over the Trust, Bilzerian provides only the declarations of his father-in-law, his wife, and the Trust's attorney. These declarations state that Bilzerian is not a trustee or beneficiary of the Trust, that he was removed as a beneficiary of the Trust by the Trust protector (who is his sister-in-law) on December 21, 1998, that he did not participate in his removal, that he was informed he was going to be removed several weeks before December 21, 1998, that he has no authority to dissolve the Trust, and that, if the Trust were dissolved that day, Bilzerian would not be entitled to receive any of its money or property. (Harry Steffan Decl. ¶ 3; Terri Steffan Decl. ¶¶ 3–4; Hodges Decl. ¶¶ 3–4.) Bilzerian has not provided the Court with a copy of the Trust instrument or the Trust's financial records.

### 2. *Overseas Holding Company*

Overseas Holding Company is a Cayman Islands corporation. (Def.'s Suppl. Opp'n Ex. 12.) The Family Trust owns 100% of its shares. (*Id.;* Harry Steffan Decl. ¶ 7.) Bilzerian's wife is president of the company. (Terri Steffan Decl. ¶ 2.) Apparently, it was formed in December 1998 for only one purpose—to be the general partner of Overseas Holdings Limited Partnership. (Harry Steffan Decl. ¶ 9.) As general partner of the Partnership it indirectly owns (1) the Bilzerian family home, (2) the pro-

March 1999 of $0.4375. *Id.* Thus, the Court's valuation of these shares is subject to change.

ceeds from the sale of the Tampa house, (3) the Minnesota property, and (4) 2,900,00 shares of common stock in Cimetrix, Inc. (Def.'s Suppl. Opp'n Ex. 12.) Bilzerian does not dispute these facts, but claims that he is not an officer, director, employee, or shareholder of Overseas Holding Company. (Def.'s Opp'n at 3, 5; Harry Steffan Decl. ¶ 10.) He has not provided copies of Overseas Holding Company's formation documents to the Court, nor any of its financial records.

### 3. *Overseas Holdings Limited Partnership*

Overseas Holdings Limited Partnership was formed on December 21, 1995, and is a Nevada limited partnership. (Starr Decl. Ex. 14.) The Partnership has only two partners—a limited partner that owns 99% and a general partner that owns 1%. (Def.'s Suppl. Opp'n Ex. 12; Starr Suppl. Decl. Ex. 2 at 9 n. 1.) The sole limited partner is the Family Trust. (Harry Steffan Decl. ¶ 8; Def.'s Suppl. Opp'n Ex. 12.) As of December 1998, the sole general partner is Overseas Holding Company. (Harry Steffan Decl. ¶ 8; Def.'s Suppl. Opp'n at 3–5.) As the Family Trust owns 100% of the shares of Overseas Holding Company, it effectively owns all of the Partnership. Before December 1998, the sole general partner was Bicoastal Holding Company (which is also 100%-owned by the Trust). (Starr Decl. Ex. 14.) The Partnership directly owns (1) the Bilzerian family home, (2) the proceeds from the sale of the Tampa house, (3) the Minnesota property, and (4) 2,900,000 shares of common stock in Cimetrix, Inc. (Tr. 3/5/99 Hr'g Ex. 1; Starr Decl. Exs. 12, 13, 15; Def.'s Suppl. Opp'n Ex. 12.) Bilzerian has not provided any financial records for the Partnership.

**10.** A Schedule 13D filed as late as December 15, 1998, and signed by Bilzerian, states that Bilzerian is a beneficiary of the Family Trust. (Starr Third Suppl. Decl. Ex. 2.)

#### 4. *Bicoastal Holding Company*

Bicoastal Holding Company is a private investment company incorporated in Nevada. Until 1995, Bicoastal was held by Bilzerian and his wife as tenants by the entireties. In December 1995, Bilzerian and his wife transferred all of Bicoastal's shares to the Family Trust. Thus, since December 1995, the Family Trust has owned 100% of the shares of Bicoastal. (Def.'s Suppl. Opp'n at 7 & Ex. 12; Harry Steffan Decl. ¶ 4; Hodges Decl. ¶ 5; Starr Decl. Ex. 15 at 11 n. 1.) Bilzerian is president and a director of Bicoastal. (Harry Steffan Decl. ¶ 5; Hodges Decl. ¶ 5.) Bicoastal currently owns about 180,000 Cimetrix shares. (Def.'s Suppl. Opp'n Ex. 12; Starr Suppl. Decl. Ex. 2 at 9.) It previously owned 600,000 shares, but sold 300,000 shares on October 19, 1997, for $201,000, and disposed of another 100,000 shares on December 26, 1997, for an undisclosed amount. (Starr Decl. Exs. 18, 20.) In addition to being a major Cimetrix shareholder, Bicoastal receives a substantial monthly income from Cimetrix pursuant to an employment contract for Bilzerian's services as president, CEO, and director of Cimetrix (discussed in more detail below). Bilzerian claims to have no present ownership interest in Bicoastal and states that he has not received a salary from Bicoastal in three years.[11] (Def.'s Suppl. Opp'n at 7, 10.) As supporting evidence, he provides a declaration from his father-in-law stating that "Bicoastal Nevada did not pay Paul A. Bilzerian a salary in 1996, 1997 or 1998 and has not paid him a salary in 1999." (Harry Steffan Decl. ¶ 11.) Bilzerian has refused to provide Bicoastal's formation documents or its financial records to the Court on the ground that Bicoastal's board of directors (consisting of his father-in-law, his mother-in-law, and his wife) have informed him that the company's business records are not to be used by him or provided to third parties for personal purposes. (Bilzerian Suppl. Decl. ¶ 3.)

#### 5. *The Bilzerian Family Home*

Bilzerian and his family live in an over 30,000 square foot mansion in Tampa, Florida.[12] In 1993, the mansion was appraised at $3.5 million. (Starr Decl. Ex. 10.) The most recent tax assessment valued the home at $3.4 million. (Starr Decl. Ex. 8 at 3.) The home is believed to be currently for sale with no set asking price. Bilzerian and his wife originally owned it jointly. In 1991, before the Court's disgorgement orders, Bilzerian transferred his interest in the property to his wife to make it her sole property.[13] (Starr Decl. Ex. 3 at 15–16.) In June 1994, one week after the closing of the bankruptcy settlement and more than one year after the Court issued its disgorgement orders, Bilzerian's wife transferred the property back to both her and Bilzerian as tenants by the entireties.[14] (Def.'s Suppl. Opp'n at 5; Terri Steffan Decl. ¶ 5; Starr Decl. Ex. 8.) As of December 1998, this appeared to be the current state of ownership according to county records. (*Id.*) However, at the March 5, 1999, show cause hearing, the SEC introduced evidence that Bilzerian and his wife transferred the property to Overseas Holdings Limited Partnership in March 1997, but did not record the transfer until January 6, 1999. (Tr. 3/5/99 Hr'g

---

11. In other submissions to the Court, Bilzerian claims to have not been paid a salary since 1989 or 1987. (Bilzerian Decl. ¶ 7; Terri Steffan Decl. ¶ 6; Bilzerian Suppl. Decl. ¶ 6.)

12. According to a newspaper article, the home is believed to be the largest private residence in the Tampa Bay area. *See* Jean Gross, *Steffan Manor on the Block: Area's Largest Home for Sale,* Tampa Tribune (Feb. 11, 1999).

13. Bilzerian states that he transferred his interest to his wife so that she could qualify for a loan to complete construction on the mansion and that the home was completed primarily with her own money. (Def.'s Opp'n at 15–16; Bilzerian Decl. ¶ 5; Tr. 3/5/99 Hr'g at 35.)

14. Bilzerian states that the primary purpose for this transfer was so that he could assist his wife in property tax litigation concerning the property. (Tr. 3/5/99 Hr'g at 37.)

Ex. 1. *See also* Def.'s Suppl. Opp'n at 5 & Ex. 8.) Bilzerian stated that he did not know why the 1997 deed was not recorded earlier. (Tr. 3/5/99 Hr'g at 32–33.) Thus, the current owner of the Bilzerian family home is the Family Trust, as it owns the Partnership in its entirety. Bilzerian disclaims any interest in the home.

### 6. *Florida Property at Taray*

Bilzerian and his wife owned another Florida home jointly, which they. also transferred to his wife's sole ownership in 1991, before the Court's disgorgement orders. (Starr Decl. Ex. 3 at 15–16.) In June 1994, a court-approved settlement with Bilzerian's bankruptcy trustee provided his wife undisputed ownership of the property.[15] (Def.'s Opp'n at 16; Def.'s Suppl. Opp'n at 3 & Ex. 5.) On December 20, 1995, both Bilzerian and his wife signed documents transferring the home to Overseas Holdings Limited Partnership.[16] (Def.'s Suppl. Opp'n at 6 & Ex. 9; Starr Decl. Ex. 13.) Bilzerian claims that he had no ownership interest in the property at the time, but was advised by his attorney to sign the deed in order to remove any cloud on the title that might impair the property's marketability. (Def.'s Opp'n at 16; Bilzerian Decl. ¶ 5.) On May 29, 1998, Bilzerian and his wife, by quitclaim deed, and the Partnership, by warranty deed, transferred the property to third parties for $667,000. (Def.'s Suppl. Opp'n at 6 & Ex. 10; Starr Decl. Ex. 17.) About $260,000 of the sale proceeds were used to pay the bankruptcy settlement. (Tr. 3/5/99 Hr'g at 36; Def.'s Suppl. Opp'n Ex. 3.) Thus, the current owner of the remaining $407,000 in proceeds is the Family Trust, as it owns the Partnership. Bilzerian disclaims any interest in these proceeds.

### 7. *Minnesota Property*

Bilzerian and his wife owned a vacation home in Minnesota, which they transferred to his wife's sole ownership in February 1991, before this Court's disgorgement orders. (Def.'s Suppl. Opp'n at 2.) In June 1994, a court-approved settlement with Bilzerian's bankruptcy trustee provided his wife undisputed ownership of the property. (Def.'s Opp'n at 16; Def.'s Suppl. Opp'n at 3 & Ex. 3.) On December 20, 1995, both Bilzerian and his wife signed documents transferring the home to Overseas Holdings Limited Partnership.[17] (Def.'s Suppl. Opp'n at 3 & Ex. 5; Starr Decl. Ex. 12.) Bilzerian claims that he had no ownership interest in the property at the time, but was advised by his attorney to sign the deed in order to remove any cloud on the title that might impair the property's marketability. (Def.'s Opp'n at 16; Bilzerian Decl. ¶ 5.) Thus, the property is currently owned by the Family Trust, as it owns the Partnership. Bilzerian disclaims any interest in the property. The property is currently valued at $792,500, according to recent tax assessments. (Starr Decl. Ex. 16).

### 8. *Six million shares of Cimetrix stock*

In June 1994, Cimetrix granted Bicoastal Holding Company options to purchase up to six million shares of its common stock for $0.16 per share. (Def.'s Suppl. Opp'n at 8.) At the same time, Bicoastal paid its shareholders—at that time, only Bilzerian and his wife—a dividend of options to purchase 5.4 million shares for $0.16 per share. (*Id.*) Bilzerian and his wife then transferred options to purchase 2.4 million shares to an irrevocable trust

---

15. The bankruptcy trustee filed suit against Bilzerian's wife seeking to set aside three property transfers as fraudulent conveyances. (Def.'s Suppl. Opp'n Ex. 1; Tr. 3/5/99 Hr'g at 36.) Bilzerian and his wife ultimately settled with the trustee for $310,000. (*Id.;* Def.'s Suppl. Opp'n Ex. 3).

16. Notably, the transfer took place the day before the Partnership's formation documents were filed.

17. Again, the transfer took place the day before the Partnership's formation documents were filed.

set up for the benefit of their children. (*Id.* at 9.) In December 1995, Bilzerian and his wife transferred the remaining options to purchase three million shares to Overseas Holdings Limited Partnership, thus effectively to the Family Trust. (*Id.*) In April 1997, Bicoastal, the Family Trust, and the Children's Trust exercised their options and acquired six million shares of Cimetrix stock.[18] (*Id.*) About 600,000 shares have been sold, for what amount Bilzerian has not made known to the Court. Of the approximately 5.4 million shares that remain, 2,315,000 are owned by the Children's Trust, 180,000 are owned by Bicoastal, and 2,900,000 are owned by the Partnership. Because the Family Trust owns Bicoastal and the Partnership, it is the beneficial owner of 3,080,000 shares. As Bilzerian claims to have no interest in these entities, Bilzerian claims to have no interest in these shares. The total current value of the 5.4 million remaining shares is approximately $17.55 million. *See supra* note 9.

### 9. Cimetrix Employment Contracts

Bilzerian is the president, CEO, and a director of Cimetrix, Inc. (Starr Second Suppl. Decl. Ex. 2 at 2.) Bicoastal and Cimetrix have contracted to have Bilzerian's salary paid directly to Bicoastal, rather than to Bilzerian himself. (Starr Second Suppl. Decl. Ex. 2 at 5; Starr Decl. Exs. 15, 18.) The most recent contract provides for a $10,000 per month salary and a $1,500 monthly living allowance. (Starr Second Suppl. Decl. Ex. 2 at 7 & E–1.) The contract also provides Bilzerian with housing, the use of an automobile, and all reasonable travel expenses, including one coach class round trip airfare per month to any destination in the United States. (*Id.*) The contract began on April

1, 1999, and extends through December 31, 2000. (*Id.*) Thus, pursuant to this contract, Bicoastal will receive $241,500 from Cimetrix for Bilzerian's services, excluding the value of the housing, car, and airfare. In addition, Bicoastal received $120,000 for Bilzerian's services in 1998, $90,000 in 1997, and $50,000 in 1996. (Starr Second Suppl. Decl. Ex. 2 at 5.) In addition to the $10,000 per month salary, the 1998 contract also provided for all living expenses and paid $2,700 a month in rent on a home in Utah for Bilzerian.[19] (Starr Decl. Ex. 15 at 9–10, Ex. 18.) Notwithstanding these facts, Bilzerian insists that he is not an employee of Cimetrix, is not paid a salary, and disclaims any interest in these contracts. (Def.'s Opp'n at 18.) As evidence, he provides a copy of his 1997 tax return in which he has claimed to have earned no wages. (Def.'s Suppl. Opp'n Ex. 13.) However, Bilzerian does not dispute that Cimetrix pays this salary to Bicoastal as compensation for his services as president, CEO, and a director of Cimetrix.

### 10. Children's Trust

Bilzerian and his wife set up an irrevocable trust for the benefit of their children in 1994. (Def.'s Opp'n at 8.) As noted above, Bilzerian and his wife transferred options to purchase 2.4 million Cimetrix shares to this Trust in June 1994. (*Id.*) The Trust exercised these options in April 1997. (*Id.* at 9.) The Trust currently holds 2.315 million shares of Cimetrix stock. (Starr Second Suppl. Decl. Ex. 2 at 8.)

### 11. Other Evidence of Bilzerian's Alleged Financial Inability

In addition to providing evidence relating to the specific assets and entities noted

---

**18.** The value of Cimetrix shares on April 30, 1997, was $5.375 per share. *See* Yahoo! Finance, *OTC BB Historical Quotes: CMXX.OB* <http://chart.yahoo.com/d?s=cmxx.ob>. Thus, deducting the $0.16 exercise price, the total value of the shares at the time they were acquired was approximately $31,290,000.

**19.** The 1998 contract also paid Bicoastal $4,000 per month for the services of Bilzerian's wife. The filing does not disclose her position with the company or the services she provides to the company. (Starr Decl. Ex. 15 at 10.)

above, Bilzerian provided evidence relating to his claimed general financial inability to comply. Bilzerian submitted a sworn declaration, dated December 16, 1998, stating that he disgorged all of his assets to the bankruptcy trustee in 1991 and that he "presently do[es] not own any assets other than clothing, a used Casio watch, and the like." (Bilzerian Decl. ¶¶ 6–7). However, he expressly qualifies this statement by claiming not to understand what it means to have an "indirect beneficial interest" in an asset. (*Id.*) Bilzerian submitted a sworn accounting, dated February 25, 1999, stating that he has assets with an estimated value of less than $5,120.[20] In addition, he submitted a sworn declaration made by his wife on May 1, 1999, stating that: (1) "To the best of my knowledge, my husband has not individually owned any other meaningful assets since 1991."; (2) "To the best of my knowledge, my husband has not been paid a salary since 1989."; and (3) "To the best of my knowledge, my husband has no means or ability to pay any portion of the Disgorgement Judgment obtained by the SEC in January 1993." (Terri Steffan Decl. ¶ 6.)

## B. Analysis of Bilzerian's Financial Inability Defense

Based on its review of the above evidence, the parties' arguments, and the case law, the Court finds that Bilzerian has fallen far short of the showing required to establish a defense of financial inability. First, he has not provided adequate documentation to establish "categorically and in detail" his inability to satisfy the Court's orders, at least in part. In fact, the Court finds substantial evidence of his ability to at least partially comply with its Orders. Second, the Court finds that Bilzerian has not made all reasonable efforts to comply with the Orders. In fact, the Court finds he has purposefully sought to insulate his

assets from the Court's reach. Third, the Court finds that, to the extent that Bilzerian cannot comply with its Orders, it is the result of his own machinations.

1. *Bilzerian has not demonstrated his financial inability to comply "categorically and in detail"*

The Court finds that Bilzerian has not met his burden of demonstrating his present inability to comply "categorically and in detail." *See Current Fin. Servs.*, 798 F.Supp. at 808. To substantiate his purported complete financial inability to comply, Bilzerian has provided his own declaration, an "accounting," a declaration made by his wife, and his 1997 tax return.[21] The Court finds that this evidence does not satisfy his burden. Neither Bilzerian nor his wife is a disinterested party; accordingly, their unsupported, conclusory declarations that Bilzerian has no assets will not satisfy his burden. *See Kenton Capital, Ltd.*, 983 F.Supp. at 16 (finding that a party's "bald and conclusory statements in his affidavit," without supporting documentation, were not sufficient evidence of his inability to comply with the court's disgorgement order); *Huber*, 51 F.3d at 10 (noting that conclusory statements of poverty are inadequate to carry one's burden of establishing an inability to comply); *In re Spanish River Plaza Realty Co.*, 155 B.R. 249, 255 (Bankr.S.D.Fla.1993) (finding that "bare financial statements" prepared by interested parties and unsupported by documentation such as bank statements and financial records failed to establish an inability to comply).

Bilzerian has not supported his submissions with any financial records other than his 1997 tax return, which states that he earned no income that year. The Court finds that the return is insufficient support

---

**20.** Specifically, he lists, *inter alia*, the following assets: (1) a Casio watch valued at less than $20; (2) cash on hand of less than $100; and (3) "miscellaneous" valued at less than $5,000. (Bilzerian Accounting.)

**21.** Bilzerian also has submitted evidence to the Court specifically addressing the SEC's claims about Bilzerian's ownership of particular assets.

of Bilzerian's claim of financial inability, for two reasons. First, a tax return by its nature provides only information about income earned during that filing year, not the total amount of assets held by the taxpayer. Thus, one tax return is of extremely limited utility in assessing Bilzerian's inability claim. Second, a tax return is a self-reporting document, and the Court believes that Bilzerian has not properly reported his income. According to Cimetrix's filings with the SEC, the company paid $90,000 for Bilzerian's services in 1997. Although by contractual arrangement this salary is paid directly to Bicoastal, Bilzerian is the person who earned the income and therefore, according to well-settled law, the salary is plainly income attributable to him. *See Lucas v. Earl,* 281 U.S. 111, 114–15, 50 S.Ct. 241, 74 L.Ed. 731 (1930) (holding that the predecessor tax statute taxed salaries "to those who earned them" and that "the tax could not be escaped by anticipatory arrangements and contracts however skillfully devised."); *United States v. Basye,* 410 U.S. 441, 450, 93 S.Ct. 1080, 35 L.Ed.2d 412 (1973) ("The principle of *Lucas v. Earl,* that he who earns income may not avoid taxation through anticipatory arrangements no matter how clever or subtle, has been repeatedly invoked by this Court and stands today as a cornerstone of our graduated income tax system."); *United States v. Beall,* 970 F.2d 343, 345–46 (7th Cir. 1992) (holding that the government had proved a tax deficiency where defendant had arranged to have his checks paid to an association but that association did not pay any portion of the money back to him.). Moreover, although Bilzerian states that he does not receive a salary from Bicoastal, he admits that in exchange for his employment with Bicoastal he receives "living expenses, [a] house, [and a] car." (Tr. 3/5/99 Hr'g at 43–44.) Payment of these expenses is also taxable income. *See England v. United States,* 345 F.2d 414

(7th Cir.1965). Thus, the Court finds that Bilzerian's 1997 tax return proves nothing and is entitled to no weight. Without support, the Court is unwilling to accept the word of Bilzerian and his wife. *See Kenton Capital, Ltd.,* 983 F.Supp. at 15.

Aside from the lack of supporting documentation, the declarations of Bilzerian and his wife are evasive and incomplete, as they do not unqualifiedly state that Bilzerian has no assets. *See United States v. Roberts,* 858 F.2d 698, 701 (11th Cir.1988) (noting that evasive and incomplete testimony will not satisfy the alleged contemnor's burden of production). Bilzerian's December 16, 1998, declaration expressly qualifies his statement that he has no assets by noting that he does not understand what it means to have an "indirect beneficial interest" in an asset.[22] (Bilzerian Decl. ¶ 7.) His cover letter to the accounting he filed on February 26, 1999, again claims that he does not know what the Court means. Assets in which Bilzerian may have an indirect beneficial interest are at the heart of this contempt application. The SEC's primary argument is that Bilzerian has attempted to hide his ability to comply with the Court's orders by transferring assets he held directly into off-shore trusts and other entities in which he maintains an indirect beneficial interest. Thus, in Bilzerian's case, failing to include indirect beneficial interests is a glaring omission and, as a result, the Court finds that his declaration and "accounting" are entitled to little, if any, weight. Bilzerian's declaration is also misleading; he claims to have disgorged all of his assets to the bankruptcy trustee, but does not mention that he transferred or exempted substantially all of his assets before filing for bankruptcy and that the bankruptcy estate consisted of only $310,000. His wife's declaration suffers from the same deficiencies. She states that Bilzerian has not "individually owned any other meaningful assets

---

**22.** As discussed in more detail below, the Court does not find Bilzerian's claim of igno-

rance credible.

since 1991." (Terri Steffan Decl. ¶ 6). By using the qualifier "individually," she expressly excludes from her statement all assets held by her and Bilzerian jointly. The Court may consider ⋅ all potential sources of funds available to Bilzerian, including jointly-owned assets. *See Hodgson v. Hotard,* 436 F.2d 1110, 1115–16 (5th Cir.1971). Thus, her exclusion of assets held jointly is another glaring omission; a one-half interest in Bilzerian's and his wife's jointly-held assets could be a very substantial financial resource. Thus, the Court also finds that his wife's declaration is entitled to little, if any, weight.

The Court also finds that Bilzerian has not demonstrated "categorically and in detail" that he lacks any beneficial interest in or control over the Family Trust (which, as noted above, indirectly and directly holds assets with a total value of approximately $15.2 million). Bilzerian claims to have no present beneficial interest in the Trust, as the Trust protector removed him as a beneficiary on December 21, 1998. However, Bilzerian has not provided the Court with the most important evidence of his relationship to the Trust: a copy of the trust instrument.[23] In light of the nature of Cook Islands' trusts, the omission deeply concerns the Court. The Cook Islands are a popular location for asset protection trusts, as the laws of the Cook Islands provide a settlor with much greater control over the trust than any United States jurisdiction allows. *See* James T. Lorenzetti, *The Offshore*

*Trust: A Contemporary Asset Protection Scheme,* 102 Com. L.J. 138, 139–140 (1997). *See also FTC v. Affordable Media, L.L.C.,* 179 F.3d 1228, 1239–41 (9th Cir.1999) (providing background information on the nature of Cook Islands' asset protection trusts). Bilzerian was a settlor of the Family Trust. The law of the Cook Islands allows a settlor to retain the power to change the trustee and the trust protector. Lorenzetti, *supra,* at 149–50. Thus, even if Bilzerian's claim that he is no longer a beneficiary or trustee of the Trust is true, the trust instrument may provide him with the power to reinstate himself as trustee and beneficiary at any time he chooses. Also, the Trust's current trustees and Trust protector—all Bilzerian's family members—may have the authority under the trust instrument to reinstate Bilzerian as a trustee and beneficiary. Bilzerian provides sworn declarations from his wife and the Trust's attorney stating that: he was removed as a beneficiary of the Trust; that he has no authority to dissolve the Trust; that if the Trust were dissolved that day, he would not be entitled to receive any money or property from the Trust; and that the only legal relationship he has to the Family Trust is as an officer and director of Bicoastal Holding Company.[24] (Terri Steffan Decl. ¶¶ 3–4; Hodges Decl. ¶¶ 3–5.) However, even if these declarations are true, they are phrased only in the present tense and do not address whether Bilzerian could be reinstated as a benefi-

---

**23.** It is inconceivable that Bilzerian does not have the ability to provide the Court with a copy of the Trust instrument; he and his wife were the Trust's settlors, until recently he was both its trustee and a beneficiary, its current trustees and Trust protector are members of the family, and the sole current beneficiary is his wife. Thus, he clearly has access to the document.

**24.** Bilzerian has also provided a second declaration from his wife stating, *inter alia,* that her husband did not contribute any individual assets to the Family Trust and that prior to transferring their family home to the Trust

she was advised by two attorneys that the property was exempt from any claims by his creditors, including the SEC. (Second Terri Steffan Decl. ¶ 2.) The Court fails to see the relevance of these statements. The Court may consider Bilzerian's beneficial interest in the Family Trust in determining his ability to comply no matter what the origin of the Trust's assets. Moreover, as noted above, the Court is not limited to considering only Bilzerian's individually owned assets in determining his ability to comply. Finally, the legal conclusions of Ms. Steffan's attorneys are not relevant to these proceedings.

ciary or trustee at a later date.[25] In addition, the Trust is revocable and Bilzerian has not informed the Court under what circumstances the Trust may be revoked. Where assets are held in an offshore trust, the "burden of proving impossibility as a defense to a contempt charge will be especially high." *See Affordable Media, L.L.C.,* 179 F.3d at 1241. By providing only incomplete disclosure concerning the Trust and refusing to provide the Trust instrument, Bilzerian clearly has not met this high burden. Moreover, his failure to provide the Trust instrument leads the Court to doubt the veracity of his claim to have no interest in or control over it. *See Huber,* 51 F.3d at 10 (noting that a district court is entitled to consider the contemnor's refusal to provide documents in assessing the credibility of his representations of poverty). In sum, without a proper copy of the Trust instrument, the Court cannot adequately assess whether Bilzerian has actually relinquished all control over its assets.[26]

Bilzerian has also failed to demonstrate that he lacks an interest in the Cimetrix salary paid to Bicoastal. In fact, the Court affirmatively finds that this salary demonstrates Bilzerian's present ability to comply, at least partially, with the Court's disgorgement orders. As noted above, Cimetrix currently pays $10,000 per month in salary and $1,500 per month in living expenses, and provides free housing, use of an automobile, and airfare in exchange for Bilzerian's services. Bilzerian claims that he is not paid a salary because, by contract, his salary is paid to Bicoastal. This argument is patently absurd. Cimetrix pays this salary in exchange for Bilzerian's

services as president, CEO, and a director of the company; thus, they clearly are his earnings, no matter what the formalities of the payment arrangement he has structured. *See Earl,* 281 U.S. at 114–115, 50 S.Ct. 241; *Beall,* 970 F.2d at 345–46. Bilzerian remains suspiciously silent as to why he chose this payment arrangement, making only one vague reference to the reason for the arrangement by stating that it "reflects the realities of my present condition." (Tr. 3/5/99 Hr'g at 44.) It is obvious to the Court that Bilzerian has voluntarily chosen this payment arrangement in order to avoid his obligations to his creditors and that, if he so desired, he could arrange for direct payment to himself. Bilzerian has not indicated that Cimetrix is unwilling to modify the employment contract and pay him directly. Nor has he indicated that Bicoastal Holding Company, which currently receives his income, will refuse to pass it on to him. Thus, the Court finds that Bilzerian's substantial salary clearly demonstrates a present ability to pay at least part of the Court's judgment.

2. *Bilzerian has not made all reasonable efforts to comply with the Orders*

■ Bilzerian has also failed to demonstrate that he has made in good faith all reasonable efforts to comply with the Court's disgorgement Orders. A party seeking to avoid a finding of contempt must demonstrate that "all reasonable avenues for raising funds have been explored and exhausted." *See Phoenix Marine Enter., Inc. v. One Hylas 46' Convertible Sportfisherman Hull No. 1,* 681 F.Supp. 1523, 1529 (S.D.Fla.1988) (internal quota-

---

**25.** Also, the SEC argues that the declarations' statements about the terms of the Trust and the circumstances of Bilzerian's removal as beneficiary are inadmissible under Federal Rules of Evidence 1002 and 1004, the best evidence rule, and that only the actual trust instrument and removal documents are evidence of their terms and legal effect. As the declarations do not affect the Court's analysis, the Court does not address the issue of their admissibility.

**26.** From what the Court knows about the Trust—(1) it is revocable; (2) until recently, a settlor of the Trust was also its trustee; (3) until recently, both settlors of the Trust were its only beneficiaries; and (4) the current trustees and Trust protector are family members—it appears to have many of the indicia of a sham trust erected as a shell to defraud creditors. *See* Lorenzetti, *supra,* at 150–51.

tion marks omitted). Bilzerian has not pointed to even a single example of an attempt to comply with the Court's judgment. Rather, his diligent efforts have been focused on how to avoid compliance with the Court's orders. As the following examples demonstrate, Bilzerian has had an ownership interest in many substantial assets since the Court's January 23, 1993, disgorgement judgment was entered, in addition to whatever assets he had at the time of the judgment.[27] However, rather than use these assets to pay the judgment, he has consistently tried to transfer them beyond the SEC's reach.

Bilzerian has been the president, CEO, and a director of Cimetrix, Inc., since 1994, but has arranged for his substantial salary to be paid to Bicoastal Holding Company, rather than to himself. From 1996 to date, Bilzerian has earned more than $300,000 in Cimetrix salary alone. In June 1994, Cimetrix granted Bicoastal Holding Company, at the time owned entirely by Bilzerian and his wife, options to purchase six million Cimetrix shares.[28] After various transfers, the options were held by three separate entities. When these options were exercised in April 1997, the value of the shares acquired was approximately $31,290,000. In December 1995, almost two years after this Court's judgment, Bilzerian transferred his one-half interest in Bicoastal Holding Company to the Family Trust. In March 1997, more

than four years after the Court's disgorgement judgment, Bilzerian transferred his one-half interest in his $3.5 million Tampa home to the Family Trust.[29] And up until December 21, 1998, more than one month after the Court issued its order to show cause why he should not be held in contempt, Bilzerian had a one-half interest in the Family Trust, which holds assets valued at approximately $15.2 million.[30]

These examples clearly demonstrate that Bilzerian has been the beneficial owner of substantial assets in the years since the judgment was entered, but he has made no attempt whatsoever to pay the judgment. Instead of complying, he has transferred the assets to entities owned and controlled by his wife and other family members. Bilzerian has never indicated to the Court that he has asked his family members to return these assets to him so that he may pay the judgment. Accordingly, it is clear that he has failed to meet his burden of demonstrating that he has made all reasonable efforts to comply with the judgment. *See, e.g., Kenton Capital, Ltd.*, 983 F.Supp. at 16 (holding defendant in contempt where he "had more than sufficient funds or assets to make the required payment, but . . . dispersed or spent the funds and assets with no credible explanation as to what other obligations he has which would take precedence over the obligations to the court."); *CFTC v. Well-*

27. Bilzerian filed a declaration with the Court about three and one-half years before the judgment stating that he had a net worth of $50 million. (Starr Decl. Ex. 1.) Due to subsequent potential business losses and asset transfers, it is unclear exactly what assets he had at the time of the judgment.

28. Bilzerian has not indicated whether these options were provided as compensation for his services to Cimetrix. If so, he was the sole initial owner of all six million options.

29. The Court is not precluded from considering Bilzerian's homestead in determining his ability to comply with its disgorgement orders. *See SEC v. AMX Int'l, Inc.*, 7 F.3d 71, 76 (5th Cir.1993).

30. The Court considers Bilzerian's recent removal as a beneficiary of the Trust perhaps the most egregious example of his attempts to avoid paying the judgment. Bilzerian readily admits that, at the time the Court issued the show cause order, he was one of two beneficiaries of the Family Trust. Yet, conveniently, he was removed as a beneficiary of the Trust one month later. The Court is highly skeptical of Bilzerian's claim not to have been involved in his removal. The Trust protector is a family member who lives in his household. While he has provided declarations from his wife and the Trust's attorney stating that he was not involved in his removal, he has not provided the Court with copies of the documents removing him, a copy of the Trust instrument, or a declaration from the Trust protector herself.

*ington Precious Metals, Inc.,* 950 F.2d 1525, 1530 (11th Cir.1992) (finding that defendant had not made all reasonable efforts to comply with the Court's disgorgement order where he had made suspicious loans to friends and relatives and had done nothing to pursue repayment other than ask for repayment). Bilzerian's attitude toward complying with the Court's order was perhaps best summarized at the March 1999 show cause hearing, at which he told the Court: "[I]t shouldn't be a shock to anybody that I . . . have no reason, I mean, to dedicate my life to trying to earn money all of which would go to basically pay a judgment that I don't believe, with all due respect to the Court, should have been entered in the first place." (Tr. 3/5/99 Hr'g at 31.)

### 3. *Bilzerian's inability to comply was self-created*

Bilzerian claims he no longer has any assets. As noted above, the Court does not believe this claim. However, even if the claim were true, Bilzerian has not established an inability defense, as he admittedly created his alleged inability himself. With full knowledge of the existence of the Court's disgorgement judgment, he voluntarily chose to transfer his assets to the Family Trust and the Children's Trust. If he cannot convince the trustees or Trust protector to return his assets to him, it is a problem of his own making. *See. e.g., Piambino v. Bestline Products, Inc.,* 645 F.Supp. 1210, 1215 (S.D.Fla.1986) (finding that attorneys who had dissipated disputed funds rather than set them aside pending resolution of the dispute had created their own inability to comply and therefore had not established an inability defense); *United States v. Lay,* 779 F.2d 319, 320 (6th Cir.1985) (upholding district court's contempt finding where defendant consciously induced his purported inability to comply by divesting himself of assets through property conveyances to family members). To allow Bilzerian to avoid the Court's disgorgement Orders through his contumacious conduct would render both the Court's Orders and the SEC's enforcement power meaningless. *See SEC v. AMX Int'l, Inc.,* 872 F.Supp. 1541, 1545 (N.D.Tex.1994).

## II. Whether Bilzerian is in Contempt of the Court's Order for an Accounting

The SEC argues that Bilzerian has committed an additional act of contempt by failing to disclose his beneficial interest in the Family Trust in his initial declaration to the Court and by failing to fully comply with the Court's order for an accounting. Bilzerian claims that he did not consider his interest in the Family Trust a beneficial interest and notes that he expressly stated that he did not understand the meaning of the term "indirect beneficial interest" in his declaration. He also claims that he ·has complied with the Court's accounting order.

 Although Bilzerian has not completely disclosed all of the financial information relevant to the SEC's contempt application, the Court declines to hold Bilzerian in contempt of its accounting order. Before a party may be held in contempt, the court must have fashioned an order that is "clear and unambiguous." *Armstrong v. Executive Office of the President,* 1 F.3d 1274, 1289 (D.C.Cir.1993) (quoting *Project B.A.S.I.C. v. Kemp,* 947 F.2d 11, 16 (1st Cir.1991)). "This requirement of clarity derives from concepts of fairness and due process." *Project B.A.S.I.C.,* 947 F.2d at 17. In light of Bilzerian's considerable business experience and history of SEC filings, *see infra* note 31, the Court harbors no doubt that he fully comprehended what he was required to disclose under the terms of the Court's order for an accounting. Nevertheless, the Court finds that its order may not have been sufficiently "clear and unambiguous"—as those terms are construed by case law—to support a finding of contempt against Bilzerian. Therefore, the Court has drafted a more specific order explicating what information Bilzerian

must provide to the SEC and the Court. Failure to comply with this more specific order will result in the imposition of contempt sanctions. The Court also finds that, despite Bilzerian's patently unconvincing claim of ignorance, civil contempt is not an appropriate remedy for his omission of his beneficial interest in the Family Trust.[31] *See Blevins Popcorn*, 659 F.2d at 1184 ("Civil contempt ... is a remedial sanction used to obtain compliance with a court order or to compensate for damages as a result of noncompliance."). In this case, Bilzerian has already remedied his omission by disclosing that he had been a beneficiary of the Family Trust in later submissions to the Court, and the SEC has not indicated that it suffered any damages as a result of the nondisclosure.

### III. Bilzerian's Motion To Strike

Bilzerian seeks to strike portions of three of plaintiff's submissions to the Court on various evidentiary grounds. Upon examination of these evidentiary objections, the Court denies Bilzerian's motion to strike. The Court finds all of Bilzerian's evidentiary objections to be either without merit and/or irrelevant, as the Court did not rely on the evidence in evaluating Bilzerian's purported inability defense.

### IV. Bilzerian's Request for Oral Argument

Bilzerian has requested that the Court provide an additional, final hearing in this matter. The SEC opposes the request. As noted above, the Court held a hearing on this matter on March 5, 1999, and a telephonic conference with the parties on April 19, 1999. Bilzerian has also been permitted to file several supplemental submissions in his defense.[32] As Bilzerian himself points out in his request "[t]his Court hardly needs any more memoranda and evidence." The Court finds that Bilzerian has had a more than adequate opportunity to present his case and an additional hearing would not be useful. Accordingly, his request for oral argument is denied.

---

**31.** As noted, Bilzerian is currently the president, CEO, and a director of a public company, Cimetrix, Inc. According to Cimetrix's May 15, 1999, annual proxy statement, Bilzerian has years of experience in the business world, has been involved in over $10 billion in corporate transactions and financing, and has a Masters in Business Administration from Harvard University. Moreover, Bilzerian has submitted filings with the SEC on numerous occasions, both recently and in the past, in which he has disclosed his indirect beneficial interest in certain assets. Similarly, he has disclosed indirect beneficial interests in the context of his bankruptcy filing. Based on his background, the Court finds it highly likely that Bilzerian was well aware that his status as a beneficiary of the Family Trust was a beneficial interest that he should have disclosed to the Court. His claimed lack of understanding of what constitutes an indirect beneficial interest is ludicrous.

**32.** To date, Bilzerian has submitted the following to the Court in opposition to the SEC's contempt application: (1) a memorandum in opposition; (2) an "accounting" of his assets; (3) a supplemental memorandum in opposition; (4) a second supplemental memorandum in opposition; (5) a request for oral argument; (6) a motion to strike; (7) a request for judicial notice; (8) a second request for judicial notice; and (9) a third request for judicial notice.