**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Edward R. SHOWALTER, Defendant.**

**Civil Action No. 98–1106(RMU).**

United States District Court, District of Columbia.

Sept. 12, 2002.

---

Mark A. Adler, John P. Sherry, Securities and Exchange Commission, Washington, DC, for Plaintiff.

Solomon L. Wisenberg, Joshua A. Mooney, Ross, Dixon & Bell L.L.P., Washington, DC, for Defendant.

## *MEMORANDUM OPINION*

URBINA, District Judge.

### HOLDING THE DEFENDANT IN CIVIL CONTEMPT AND IMPOSING SANCTIONS

## I. INTRODUCTION

This matter is before the court on the application of the Securities and Exchange

Commission (the "plaintiff" or the "Commission") for an order to show cause and for an order (1) holding the defendant in civil contempt for his violation of the court's May 15, 2001 Final Judgment of Permanent Injunction and Other Relief Against Edward R. Showalter ("Final Judgment") requiring him to pay disgorgement in the amount of $538,400, pre-judgment interest in the amount of $213,560, and a civil penalty in the amount of $150,000 on or before May 31, 2001; (2) directing the defendant to provide an accounting of his assets; and (3) requiring other relief. In response to this application, the court held an extended show cause hearing beginning on June 3, 2002. On this date, after considering the application and opposition thereto, the court found the defendant, Mr. Showalter, in civil contempt of the Final Judgment and ordered Mr. Showalter to file a sworn accounting. Having considered further submissions from the parties, the court now holds that Mr. Showalter has failed to purge the court's finding that he is in civil contempt of court and sanctions Mr. Showalter accordingly. The court also finds that Mr. Showalter intentionally misrepresented the truth during his testimony at the show cause hearing and when he swore to the accuracy of the accounting documents.

## II. BACKGROUND

The Commission initiated this securities fraud case against Mr. Showalter and other defendants involved with Mr. Showalter's failed business, Hollywood Trenz, Inc., on May 4, 1998. In its complaint, the Commission alleges that Mr. Showalter orchestrated two fraudulent schemes to raise capital illegally. Compl. ¶ 1. In the first scheme, Hollywood Trenz materially overstated the value of the primary asset of a wholly owned subsidiary in reports filed with the Commission and disseminated to the public. *Id.* ¶ 2. In the second scheme, Hollywood Trenz fraudulently raised millions of dollars by issuing Hollywood Trenz stock, pursuant to Form S–8 [1] registration statements, to "consultants," purportedly to compensate them for bona fide services to Hollywood Trenz. *Id.* ¶ 3. The Commission alleged that the majority of the S–8 stock was used to raise capital for Hollywood Trenz by using the consultants as conduits through which Hollywood Trenz distributed the shares to the public. *Id.* The Commission further alleged that Mr. Showalter caused Hollywood Trenz's periodic reports filed with the Commission, as well as Hollywood Trenz's books and records, to misstate or fail to disclose other material information, including the amount of Mr. Showalter's executive compensation and certain related party transactions. *Id.* ¶ 4.

The court will first detail Mr. Showalter's violations of the court's orders that occurred during the pendency of the litigation. Next, the court will introduce the current contempt proceedings relating to the Commission's May 21, 2002 application for an order to show cause and for other relief.

**1. Notice.** On June 8, 2000, the court issued a scheduling order setting trial in this matter for December 4, 2000. At that status conference, the court warned Mr. Showalter's counsel that Mr. Showalter needed to give his full attention to the case, restructure his priorities, and personally attend a mediation session with United

---

1. Form S–8 is an SEC form that, upon filing, provides for the registration of company stock for the sole purpose of compensating employees and consultants, provided that the consultants' services are not rendered in connection with the offer or sale of securities in a capital-raising transaction. Compl. ¶ 3.

States Magistrate Judge Alan Kay on June 29, 2000. Mr. Showalter's appearance at the June 29, 2000 mediation session with Magistrate Judge Kay indicates that he was aware of the schedule in this case. In addition, on August 22, 2000, at a pretrial conference, Mr. Showalter's counsel, Mr. Altschul, advised the court that Mr. Showalter was aware of the December trial date, Mr. Showalter had received copies of all documents in this case by facsimile, and it was Mr. Altschul's practice to keep Mr. Showalter apprised of all developments in the case.

2. **August 22, 2000 Order.** At the August 22, 2000 pretrial conference, the court denied without prejudice defense counsel's motion to withdraw. The court attempted to reach Mr. Showalter by telephone, at a number provided by Mr. Altschul, but was unsuccessful. Consequently, the court ordered Mr. Showalter to appear by telephone for a hearing with the court and counsel on September 8, 2000 at 9:00 a.m. so that the court could ascertain, among other things, Mr. Showalter's current address and whether Mr. Showalter was going to defend this case. The court expressed its concern that Mr. Showalter was playing games with the court and emphasized to Mr. Showalter's counsel the need for Mr. Showalter to participate in the telephone conference. At some point thereafter, Mr. Showalter's attorney advised him of the court's August 22, 2000 order directing Mr. Showalter to appear by telephone on September 8, 2000. Altschul, Landy & Collier, P.A.'s Renewed Motion to Withdraw as Counsel, dated October 6, 2000 ("Altschul Renewed Motion") ¶ 3.

On September 8, 2000 at 9:00 a.m., the court convened a telephonic conference call with counsel for Mr. Showalter and the Commission, during which the court attempted to contact Mr. Showalter at various telephone numbers provided by Mr. Altschul. At the first telephone number (for a location in Beirut, Lebanon), the court reached a recording in French, English, and Arabic indicating that the number was not in service. At the second telephone number, Mr. Showalter's cellular telephone in Lebanon, the court received a message that the telephone was "out of the area." By failing to appear at the telephonic conference call, Mr. Showalter violated the court's August 22, 2000 order.

3. **September 7, 2000 Memorandum Order.** On September 7, 2000, Magistrate Judge Kay issued a memorandum order granting the Commission's motion to compel production of documents and requiring Mr. Showalter, within ten days, to:

(1) produce to the Commission all documents in his possession, custody or control that are responsive to the subpoena issued to him, dated June 20, 2000, wherever those documents are located . . ., and (2) attend a deposition at the Securities and Exchange Commission . . . to answer questions about his document production.

Mem. Order dated Sept. 7, 2000. In addition, Judge Kay ordered Star Entertainment Group, Inc. ("Star"), a company controlled by Mr. Showalter and for which he was an agent, to produce to the Commission all documents responsive to the subpoena issued to Star. *Id.* Judge Kay further ordered Star's custodian of records to attend a deposition regarding the production of the records. *See id.* By January 5, 2001, the date of the default order, neither Mr. Showalter nor Star had provided any documents to the Commission, and indeed, neither responded to the subpoenas, in violation of the September 7, 2000 memorandum order.

Pursuant to Judge Kay's memorandum order, the Commission also duly noticed depositions of Mr. Showalter's and Star's

custodian of records for September 18, 2000 at the Commission's offices in Washington, D.C. 9/18/00 Tr. at 5–6. Mr. Showalter and Star (as well as their counsel) failed to appear at the court-ordered depositions, in violation of the September 7, 2000 memorandum order. *Id.* at 4–8. After Commission counsel contacted Mr. Showalter's counsel by telephone from Mr. Showalter's scheduled deposition on September 18, 2000, Mr. Altschul advised Commission counsel that he had informed Mr. Showalter in a telephone conversation on September 13, 2000 about the depositions, and that Mr. Showalter and Star would not be appearing at the depositions. *Id.* at 2–9.

**4. September 30, 2000 Order.** On September 30, 2000, Judge Kay ordered Mr. Showalter and Joseph Altschul, jointly and severally, to "pay to the Securities and Exchange Commission its reasonable expenses incurred in making its motion for an order to compel, including its attorney's fees, in the amount of $5,600, within thirty days of the date of this Order." Order dated Sept. 30, 2000. Mr. Showalter failed to comply with the September 30, 2000 order.

**5. November 21, 2000 Order.** On November 7, 2000, the court granted defense counsel's renewed motions to withdraw. Thereafter, on November 21, 2000, the court issued an order vacating the December 4, 2000 trial date and scheduled a status hearing for December 4, 2000 at 10:00 a.m. The court further instructed that "the court may enter default judgment against any party who fails to appear at the status hearing now set for December 4, 2000." Order dated Nov. 21, 2000.

The Commission made numerous efforts to serve Mr. Showalter with a copy of the court's November 21, 2000 order at his business addresses and the address that his lawyer provided to the court. On De-

cember 4, 2000, the court held a status hearing, however, and Mr. Showalter failed to appear. This failure to appear was in violation of the court's November 21, 2000 order, even though the defendant had been aware for months that trial was scheduled to begin on that day. Mr. Showalter also failed to make any effort to contact the court before the December 4, 2000 hearing. Thus, at the December 4, 2000 hearing, the Commission asked the court to find Mr. Showalter in default and the court did so.

**6. May 15, 2001 Final Judgment of Permanent Injunction and Other Relief Against Edward R. Showalter.** As noted initially, on May 15, 2001, this court issued the Final Judgment, setting forth the injunction and other relief against the defendant as a result of the default judgment entered against him on April 30, 2001. The court prohibited Mr. Showalter from violating various securities laws and required him to pay disgorgement in the amount of $538,400, pre-judgment interest in the amount of $213,560, and a civil penalty in the amount of $150,000 on or before May 31, 2001. Final J. dated May 15, 2001. The Commission mailed the final judgment to Mr. Showalter's known addresses on May 18, 2001, and posted the judgment on the Commission's website on October 25, 2001. Pl.'s Application for Order to Show Cause ("Pl.'s Application"), Ungar Decl. ¶ 4. The addresses the Commission used were Mr. Showalter's residence and business addresses in Las Vegas, Nevada. *Id.* Though the mail sent to these addresses was returned to the Commission, Mr. Showalter used the Las Vegas business address on a tax return filed on November 13, 2001. *Id.*

**7. May 22, 2002 Order to Show Cause and for Other Emergency Relief.** Pursuant to an *ex parte* application by the Commission, this court issued an Order to

Show Cause and for Other Emergency Relief on May 22, 2002. Pl.'s Application; Order dated May 22, 2002. The order to show cause directed the defendant to respond by May 29, 2002 and set a hearing for June 3, 2002. Order dated May 22, 2002. The order also required Mr. Showalter to provide the clerk's office with his passport and ordered various financial entities to freeze Mr. Showalter's assets. *Id.* Mr. Showalter responded to the order to show cause on May 31, 2002, appeared for the show cause hearing on June 3, 2002, and at the hearing surrendered his passport to the court. 6/3/02 Tr. at 1, 20. By June 3, 2002 the defendant had submitted no payments toward the judgment.

**8. June 3, 2002 Finding of Civil Contempt.** The show cause hearing began on June 3, 2002 and ended three days later. On June 3, 2002, the court determined that the Commission met its initial burden by making a *prima facie* showing for contempt and that Mr. Showalter had failed to justify his noncompliance with the Final Judgment. 6/3/02 Tr. at 18–20. Thus, the court found Mr. Showalter in contempt of the May 15, 2001 Final Judgment. *Id.* Mr. Showalter's consistent disregard for his responsibilities to the court indicated to the court that no lesser sanction than a civil contempt order would be effective to ensure that Mr. Showalter satisfies the requirements of the Final Judgment. *Id.* The court sanctioned Mr. Showalter on June 3, 2002 by incarcerating him for one day, freezing his assets, and refusing to return his passport. 6/3/02 Tr. at 18–20. In response to Mr. Showalter's promises to provide sworn accountings for his own finances and those of his new company, International Financial Group ("IFG"), the court released him from jail and unfroze some of his assets. 6/4/02 Tr. at 50–53; 6/6/02 Tr. at 205. Following are findings of fact and conclusions of law relating to the show cause hearing and the subse-

quent discovery and submissions regarding the defendant's assets and his ability to purge himself of the civil contempt finding.

## III. FINDINGS OF FACT

### A. The May 15, 2001 Final Judgment

1. On May 15, 2001, this court enjoined Mr. Showalter from violating the anti-fraud provisions and other provisions of the federal securities laws, and ordered Mr. Showalter to pay disgorgement in the amount of $538,400 and pre-judgment interest in the amount of $213,560 on or before May 31, 2001. Final J. dated May 15, 2001.

2. Mr. Showalter made no payments on the judgment until more than a year later—$300 on June 17, 2002; $150 on July 22, 2002; $1,000 on August 27, 2002; and $500 on August 29, 2002. 6/25/02 Tr. at 173; Ross, Dixon & Bell letters dated June 17, July 22, Aug. 27, and Aug. 29, 2002.

### B. The Defendant's Extravagant Lifestyle Since the Final Judgment

3. In 2002, the defendant has received a salary of at least $8,000–$10,000 per month. Adler Decl. Ex. 3 at 5; 6/25/02 Tr. at 157–61; 6/4/02 Tr. at 37–38; Ross Dixon & Bell letter dated Aug. 13, 2002.

4. Since the Final Judgment, Mr. Showalter has taken extravagant vacations at luxury resorts. Following are three examples:

a) In late January 2002, Mr. Showalter stayed at the St. Regis Monarch Beach Resort & Spa with, "[a] friend of mine. I don't—I can't recall her name." 6/26/02 Tr. at 271. Mr. Showalter used his IFG check card to pay for resort charges totaling over $1,900 though he explained that the charges were "personal. They are for me." *Id.*

b) Mr. Showalter also vacationed at the Disney Grand Californian Hotel in January 2002, accompanied by "I don't recall her name." *Id.* at 329. On this vacation Mr. Showalter charged over $500 to his personal credit card, which he often pays with IFG funds. *Id.* at 321, 329; Adler Decl. Ex. 8.

c) On April 27, 2002, Mr. Showalter again visited the Disney Grand Californian Hotel, this time with Natasha Gonimar, age 21, and Svetlana Gonimar, age 25, two Ukrainian IFG employees whose job titles he could not recall. 6/25/02 Tr. at 58–60; 6/26/02 Tr. at 223–25. The three of them stayed in one room and incurred charges of over $1,300 that were paid for by IFG as a business expense. 6/26/02 Tr. at 223–27.

5. Since the court's Final Judgment, Mr. Showalter has bought expensive jewelry and gifts for several people, including his employee Natasha Gonimar, totaling at least $2,300. *Id.* at 262–67, 274–76. He charged at least $1,000 worth of gifts to his IFG check card. *Id.*

6. In March 2002, Mr. Showalter moved to a house located at 6210 Colina Pacifica Drive. 6/25/02 Tr. at 68. The rent, $4,000 per month, was split evenly between Mr. Showalter and IFG. *Id.* at 70–73. For several months, Mr. Showalter lived at the house with Natasha and Svetlana Gonimar. *Id.* at 58–60. Mr. Showalter used IFG funds to buy furniture, valued at about $30,000, for the house. *Id.* at 119–23.

7. On or about February 2002, Mr. Showalter paid $20,000 for a nonrefundable option to purchase the 6210 Colina Pacifica Drive property for $860,000, but he did not ultimately purchase the home. *Id.* at 106–08, 113. The defendant originally treated this payment as an IFG business expense. *Id.* at 105–106. On the advice of the accountant retained by Mr.

Showalter and IFG after the show cause hearing, Mr. Showalter now is treating the $20,000 amount as a personal loan from IFG. *Id.*

### C. The June 3–6, 2002 Show Cause Hearing

8. During the show cause hearing, Mr. Showalter testified that he does not possess assets that he could sell in order to acquire proceeds to pay a substantial portion of the Final Judgment. 6/4/02 Tr. at 22–23, 38–39.

9. Mr. Showalter also testified that IFG's continued viability and possibility for success depends on his ability to travel overseas. 6/5/02 Tr. at 69–70.

10. Mr. Showalter and his counsel repeatedly represented to the court that Mr. Showalter would provide a full and complete sworn accounting of his and IFG's finances within two weeks of the hearing. 6/3/02 Tr. at 10, 12; 6/4/02 Tr. at 37; 6/6/02 Tr. at 194. Mr. Showalter and his counsel told the court that the only items that would be missing from the accountings were tax returns that Mr. Showalter needed to complete. 6/3/02 Tr. at 10; 6/4/02 Tr. at 37.

### D. The Defendant's Deficient Sworn "Accountings"

11. On June 18, 2002, the court ordered Mr. Showalter to provide sworn accountings of his and IFG's finances no later than June 20, 2002 (the date that Mr. Showalter's counsel requested), by completing and signing before a notary the forms attached to the court's order, which documented the June 6, 2002 oral order for the accountings. Order dated June 18, 2002; 6/6/02 Tr. at 204.

12. On June 20, 2002, Mr. Showalter submitted his first attempted "accounting." The sworn financial statements for himself and IFG were illegible, hand-written, and

they included attachments totaling several hundred pages. Def.'s Notice of Filing dated June 20, 2002; Adler Decl. Ex. 2.

13. In addition to being illegible, these statements failed to identify how the attached documents related to particular questions or forms. Adler Decl. Ex. 2; Ross, Dixon & Bell letter dated June 20, 2002. Moreover, there were unidentified documents attached to the handwritten "accounting" that were not part of the accounting but apparently were responsive to the IFG document subpoena. The Commission immediately requested that Mr. Showalter provide a typewritten version of the accounting and specifically identify which documents relate to which questions and which statement forms, and which documents respond to the subpoena. Commission letter dated June 21, 2002. The Commission also asked the defendant to provide Bates numbers on the documents. *Id.*

14. On June 24, 2002, the day before Mr. Showalter's asset deposition, Mr. Showalter provided his second attempted "accounting" to the Commission. It consisted of typed sworn financial statements for the defendant and IFG with hundreds of pages attached that were simply clipped and marked with yellow "post-it" notes in an apparent attempt to identify the questions to which the documents relate. Adler Decl. Ex. 3; Ross, Dixon & Bell letter dated June 24, 2002. The new "accounting" was still deficient: Mr. Showalter left some questions unanswered and answered other questions incorrectly because, according to his testimony, he "forgot" certain information, "misunderstood" or "misinterpreted" the questions, or was "confused." 6/25/02 Tr. at 142–43, 170–71, 175–76; 6/26/02 Tr. at 210–13.

15. In addition, on the sworn statement submitted for IFG, Mr. Showalter did not enter a figure for the total historical receipts of IFG for the last 12 months, nor did he indicate on the form how much money IFG received from investors and himself. 6/26/02 Tr. at 194–200. Further, Mr. Showalter did not provide figures for historical disbursements for IFG, and instead attached voluminous documents purportedly in response to the requests for information and stated that he also needed Western Union records to complete the form. *Id.* at 204–08.

16. Mr. Showalter made no attempt to total the receipts attached to the "accounting" in order to answer specific questions, and made no attempt to match particular checks to particular receipts. 6/25/02 Tr. at 159–60; 6/26/02 Tr. at 205–06, 292–93, 313–14. Many documents included in the first hand-written "accounting" were not included in the second typed "accounting," and vice versa, and documents that were in both accountings were in a different order. Pl.'s Submission at 4; Ross, Dixon & Bell letter dated June 24, 2002. Mr. Showalter provided no explanation for these discrepancies. *Id.* Mr. Showalter also made no effort to identify the questions from the Commission's forms to which the documents relate. *Id.* Mr. Showalter testified at his asset deposition, on June 25–27, 2002, that the attachments to the "accountings," which he did not review prior to their submission, 6/25/02 Tr. at 90, 96–97, 103, also are incomplete. *Id.* at 6/25/02 Tr. at 126–28, 135–36, 140; 6/26/02 Tr. at 228. **Mr. Showalter attempted to deflect blame for the sworn accountings' shortcomings by asserting (or admitting) that he never reviewed the documents.** 6/25/02 Tr. at 90, 96–97, 103. Yet he read and swore to the following statement with regard to both versions of IFG's accounting (and to a similar statement for the accounting of his personal finances):

Under penalties of perjury, I declare that **I have examined the information**

given in this statement, **including the documents and information attached to it,** and to the best of my knowledge and belief, it is true, correct, and complete.

Adler Decl. Exs. 2, 3 (emphasis added); 6/25/02 Tr. 87–90.

17. At his deposition, Mr. Showalter testified that IFG has had no accounting system, did not have any financial records for 2002 (except a checkbook or check register and some receipts), and only recently began implementing an accounting system. 6/25/02 Tr. at 131–35.

18. In August 2002, after the court-ordered asset deposition and after the deadlines for the parties' submissions, counsel for the defendant sent the Commission and the court several letters with attachments purporting to "conclude Mr. Showalter's accounting." Ross, Dixon & Bell letters dated Aug. 5, 9, and 13, 2002.

19. Notwithstanding defense counsel's belated correspondence with attached financial data, **Mr. Showalter still has not provided critical information and documentation *under oath* concerning his use of a substantial amount of money that he received, including specific items described in the Commission's initial submission.** Pl.'s Reply at 2–3.

a) For example, Mr. Showalter has raised at least $525,000 from investors in the last year, ostensibly for the purported IFG enterprise; however, he has neither explained nor documented what happened to all of those funds. 6/26/02 Tr. at 195. Indeed, he reported total assets of only approximately $100,000 on the sworn IFG

accounting dated June 21, 2002. Adler Decl. Ex. 3.

b) As another example, in addition to payments of thousands of dollars of personal expenses Mr. Showalter incurred using the IFG check card, Mr. Showalter has written checks to himself, from IFG's account, totaling at least $159,730 since December 2001.[2] *Id.* Ex. 8; 6/25/02 Tr. at 271; 6/26/02 Tr. at 274–76, 329; Ross Dixon & Bell letter dated Aug. 13, 2002, Tab B. At his deposition, Mr. Showalter could not distinguish between checks for personal expenses and checks for business expenses. 6/25/02 Tr. at 124; 6/26/02 Tr. at 311–317.

c) Mr. Showalter has neither explained nor provided documentation showing the use of over $70,000 in cash that he received from Western Union wire transfers while he was in Ukraine from June 2001 through February 2002, including: (1) $32,000 that came from the IFG general operating account and that was wired to Mr. Showalter; (2) $25,200 from Ron Evans[3] and his representative to Mr. Showalter in Ukraine; and (3) $12,000 from John Staback to Mr. Showalter in Ukraine. Adler Decl. Ex. 10; Pl.'s Reply Ex. C.

d) Mr. Showalter has yet to explain or provide documentation for his many large cash withdrawals and transfers from the IFG general account (such as two $5,000 checks dated February 7, 2002 payable to Mr. Showalter with "Jeff Schultz" noted in the memo line), even though the Commission questioned him about this money at his asset deposition. 6/26/02 Tr. at 268–69, 274, 282, 287–88.

---

**2.** Mr. Showalter converted these checks to cash. Ross Dixon & Bell letter dated Aug. 13, 2002.

**3.** Mr. Showalter, Ron Evans, and Jeff Schultz have been involved in IFG from "the begin-

ning." 6/26/02 Tr. at 284. They have no formal arrangement or contract, but "[I]n August, when everything is settled out, we will decide, the three of us will decide how the balance is going to be split up." *Id.*

20. Mr. Showalter also transferred a substantial amount of IFG funds to his business partner, Jeff Schultz and Mr. Schultz's son purportedly for "consulting fees." *Id.* at 282, 286–88. In addition to the two $5,000 checks (described in ¶ 19(d) *supra*) written for Jeff Schultz's consulting fees on February 7, 2002, on February 8, 2002, Mr. Schultz's son received a wire transfer of $15,500 in IFG funds. Yet, IFG has no written consulting agreement and provided no documentation to support these claims. *Id.* According to Mr. Showalter's testimony at the show cause hearing, Mr. Schultz is the same individual who purportedly had invested over $1,000,000 in IFG. 6/6/02 Tr. at 173. This statement was apparently false, according to Mr. Showalter's more recent deposition testimony. 6/26/02 Tr. at 283–85, 296–302, 417–22; 6/27/02 Tr. at 441–44. Practically all of Mr. Schultz's investment (which Mr. Showalter now says is between $500,000–$600,000) was in Star, an earlier failed venture. 6/27/02 Tr. at 441–44. Nevertheless, after the court ordered Mr. Showalter to refund to all investors, pro rata, the money that had been frozen in the IFG general operating account, Mr. Showalter refunded $13,000 to Mr. Schultz, far more money than any other investors received. *Id.* at 488; Adler Decl. Ex. 16 (Pl.'s Exs. 37, 38).

21. Notwithstanding the numerous transfers of cash by IFG to Mr. Showalter and the substantial payments to Mr. Schultz and his son, when asked to list and attach complete documentation for all IFG transfers of assets with a cost or value of $5,000 or more on the IFG sworn accounting form, Mr. Showalter wrote "NONE." Adler Decl. Ex. 3 (IFG Form at 13, ¶ III.F).

### E. Additional Misrepresentations by the Defendant

22. Mr. Showalter provided financial statements to potential investors, lenders, and others which included representations that he personally contributed $1.6 million to IFG, as well as other representations about IFG's finances, that Mr. Showalter now says are completely false. Pl.'s Submission at 14–16 (citations omitted). Mr. Showalter also provided potential investors, lenders, and others with a fraudulent professional profile about himself that, among other things, concealed his role at Hollywood Trenz and Star. *Id.* at 14.

23. Mr. Showalter misrepresented the truth during his testimony at the show cause hearing:

(a) For example, answering questions about the plaintiff's Show Cause Hearing Exhibit 11, a list of Western Union transfers, Mr. Showalter testified that the items were business expenses. Pl.'s Show Cause Hrg. Ex. 11; 6/6/02 Tr. at 155. Then when pressed he admitted: "Some of that could be personal. Some of it I am sure is business." *Id.*

(b) In another example, on June 4 and 6, 2002, Mr. Showalter testified that he first learned of the Final Judgment against him in early April 2002 when he received a collection letter from Ocwen Federal Bank. *Id.* at 165–66; 6/4/02 Tr. at 43. Then, when faced with a declaration from Ocwen representative Joseph Stoudt that contradicted his testimony, Mr. Showalter stated that he had learned about the judgment several months before April 2002. Stoudt Decl.; 6/6/02 Tr. at 165–66.

(c) After the Commission showed Mr. Showalter the redacted phone bill for April 17, 2002 that Mr. Showalter had earlier provided to the court, the Commission asked when he had spoken to Tracy Braime, his ex-wife. Pl.'s Show Cause Hrg. Ex. 10; 6/6/02 Tr. at 150–51. Mr. Showalter stated that he had spoken to Ms. Braime about one month prior to the

hearing (about May 6, 2002). *Id.* The Commission asked Mr. Showalter when, in relation to the Ocwen call, did he speak with Ms. Braime, and Mr. Showalter could not recall. *Id.* Only when the Commission showed Mr. Showalter a non-redacted version of his phone bill did he acknowledge that he actually called Ms. Braime 11 minutes after speaking with Ocwen. Pl.'s Show Cause Hrg. Ex. 12; 6/6/02 Tr. at 159–60. Soon after speaking with Ms. Braime, Mr. Showalter wired $1,000 to her, though he had no obligation to give her money. 6/6/02 Tr. at 150–65. Two weeks later, he wired $500 to her. *Id.* Mr. Showalter had redacted the April 17, 2002 call to Ms. Braime from the phone bill he provided to the court. Pl.'s Show Cause Hrg. Ex. 10; 6/6/02 Tr. at 159–62.

## IV. ANALYSIS

### A. Legal Standard For Civil Contempt

■ A party moving for a finding of civil contempt must show, by clear and convincing evidence, that: (1) there was a court order in place; (2) the order required certain conduct by the defendant; and (3) the defendant failed to comply with that order. *Armstrong v. Executive Office of the President,* 1 F.3d 1274, 1289 (D.C.Cir.1993); *SEC v. Bilzerian,* 112 F.Supp.2d 12, 16 (D.D.C.2000). The defendant's intent regarding compliance with the order is irrelevant. *Bilzerian,* 112 F.Supp.2d at 16. Once the court determines that the movant has made the above three-part showing, the burden shifts to the defendant to justify the noncompliance. *Id.* Justifications may include financial inability to pay *any* of the judgment, or good faith attempts to comply. *Id.* at 16–17. In both cases, however, the justifications must be accompanied by adequate detailed proof. *Id.*

■ Inability to comply is a complete defense only if the defendant cannot pay any of the judgment; otherwise, he must make good faith attempts to comply by paying what he can. *Id.* at 17, 27. To show good faith, the defendant's duty includes the obligation to be "reasonably diligent and energetic in attempting to comply with [this court's] order," and to pay what he can toward the judgment, even if that results in diminution of his income or standard of living. *SEC v. Musella,* 818 F.Supp. 600, 601–02 (S.D.N.Y. 1993); *see also SEC v. Porto,* 748 F.Supp. 671, 672 (N.D.Ill.1990) (stating that a defendant's failure to tender partial payment showed absence of good faith).

■ In order to succeed on an inability defense, a defendant "must go beyond a mere assertion of inability," and establish that she has made "in good faith all reasonable efforts" to comply with the court's orders. *Commodity Futures Trading Comm'n v. Wellington Precious Metals,* 950 F.2d 1525, 1529 (11th Cir.1992) (internal citations omitted); *Bilzerian,* 112 F.Supp.2d at 17. In addition, to the extent that a defendant's inability to comply is self-induced, it is not a defense to a finding of contempt. *United States v. Lay,* 779 F.2d 319, 320 (6th Cir.1985); *Bilzerian,* 112 F.Supp.2d at 17. The burden shifts back to the movant only upon a sufficient showing by the defendant that she is not able to comply with the judgment. *Fed. Trade Comm'n v. Affordable Media, LLC,* 179 F.3d 1228, 1239 (9th Cir.1999); *Wellington Precious Metals,* 950 F.2d at 1529.

■ Regarding sanctions, civil contempt is a remedial device that a court can utilize to achieve full compliance with its orders. *SEC v. Bankers Alliance Corp.,* 881 F.Supp. 673, 678 (D.D.C.1995). When selecting what sanction to impose, a court must "exert only so much authority of the court as is required to assure compliance."

*Id.* (citations omitted). Moreover, "sanctions imposed in civil contempt proceedings therefore ordinarily are conditional, and a person or entity held in civil contempt may avoid the sanctions by promptly complying with the court's order." *Petties v. Dist. of Columbia*, 897 F.Supp. 626, 629–30 (D.D.C.1995).

### B. The Defendant Has Failed to Purge Himself of the Civil Contempt Finding

The Commission has already demonstrated that (1) there was a court order in place; (2) the order required certain conduct by the defendant; and (3) the defendant failed to comply with that order. *Bilzerian*, 112 F.Supp.2d at 16; Part II, *supra*, ¶ 8. As of June 3, 2002, the defendant had failed to justify his noncompliance. *Id.* Thus, the issue here is whether the defendant has now justified his noncompliance and thereby purged himself of the earlier contempt finding. *Id.* To justify his noncompliance, Mr. Showalter must demonstrate, with adequate proof, either an inability to pay any of the judgment or a good faith attempt to comply. *Bilzerian*, 112 F.Supp.2d at 16–17. Mr. Showalter must establish what he can afford to pay, if anything, "clearly, plainly and unmistakably." *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir.1995).

 Mr. Showalter argues that he is not able to pay the judgment in full, his payments of $1950 and "accountings" demonstrate good faith attempts to comply with the Final Judgment, and until IFG becomes more lucrative, payments of $1,000 per month should suffice. Def.'s July 16, 2002 Submission ("Def.'s Submission") at 11; Def.'s Prop. Findings ¶ 114; Part III, *supra*, ¶ 8. In support of this argument, the defendant's proposed findings of fact and July 16, 2002 submission offer dozens of highly technical facts regarding Mr. Showalter's and IFG's multiple bank accounts, their income taxes, and IFG's accounting systems or the lack thereof. Def.'s Prop. Findings ¶¶ 21–126; *see generally* Def.'s Submission. Despite the court's order for a sworn accounting, some of the proposed findings of fact rely on financial information to which Mr. Showalter has not sworn. *E.g.* Prop. Findings Ex. E; Pl.'s Reply at 2–3; Pl.'s Prop. Findings ¶ 17. Demonstrating the deficiencies of the defendant's attempts to submit sworn accountings, the Commission offers facts and an analysis of the facts showing that vast amounts of money remain unexplained, under oath or otherwise. Part III, *supra*, ¶¶ 3, 19, 20.

Considering the many flaws in the defendant's purported sworn accountings, the fact that he never actually reviewed the documents he swore to, his record of using IFG's money for personal expenses, the vast amounts of money unaccounted for by the sworn accountings, and the defendant's extravagant lifestyle, the court is not convinced by Mr. Showalter's proposed facts and arguments. *See generally* Part III, *supra.* On June 4 and 6, 2002, in response to Mr. Showalter's promises to comply with the Final Judgment and to purge himself of the contempt finding, the court gave Mr. Showalter another opportunity to demonstrate either inability to pay or good faith by releasing him from jail and unfreezing some of his assets. 6/4/02 Tr. at 50–53; 6/6/02 Tr. at 205; *Petties*, 897 F.Supp. at 629–30. Despite the court's admonitions and its willingness to let Mr. Showalter demonstrate good faith, Mr. Showalter continues to flagrantly disregard the court's orders and continues to act in bad faith. *E.g.*, Part III, *supra*, ¶ 16, 20, 23. In sum, the defendant has failed to purge the contempt ruling.

### 1. The Defendant Has Been Dishonest and Evasive

Mr. Showalter's attitude toward the court has been one of stubborn defiance.

Testifying before the court on June 3–6, 2002 and at his asset deposition on June 25–27, 2002, Mr. Showalter was deceptive and evasive, and he intentionally lied to the court and the Commission while under oath: *Id.* ¶¶ 16, 19, 20, 22, 23. Furthermore, for the accounting, Mr. Showalter utterly disregarded the requirement of accuracy and the court's directions. *Id.* ¶¶ 11–21; Order dated June 18, 2002. In stating "NONE" for the accounting form question regarding transfers of IFG assets over $5,000 when many such transfers existed, and in swearing to having examined the documents when he had not, Mr. Showalter blatantly and blithely lied. Part III, *supra,* ¶ 16, 21.

Mr. Showalter has demonstrated to the court that he evades the truth through fabrications and memory lapses when confronted with inculpatory facts. *Id.* ¶ 23. For example, at one point Mr. Showalter testified that certain items were business expenses, and then when pressed admitted: "Some of that could be personal. Some of it I am sure is business." *Id.* In another example, on June 4 and 6, 2002, Mr. Showalter testified that he first learned of the Final Judgment against him in early April 2002 when he received a letter from Ocwen Federal Bank. *Id.* Then, when faced with a declaration contradicting his testimony, he stated that he had learned about the judgment several months earlier. *Id.* In addition, 11 minutes after receiving the call from Ocwen, Mr. Showalter called Tracy Braime and wired $1,000 to her. *Id.* He apparently forgot these facts when testifying, though he had redacted the record of his call to Ms. Braime from the phone bill he provided to the court. *Id.*

Recognizing a need to explain the odd juxtaposition of his extravagant lifestyle with his inability to pay more that $1,950 of the judgment, Mr. Showalter presents absurd explanations for his personal expenditures. In his submission, the defendant argues that he lived in a $4,000–per–month house with his young female Ukranian employees, took them to Disneyland, and bought them expensive gifts, all because of "the threat of illegal emigration." Def.'s Submission at n. 13; Part III, *supra,* ¶¶ 4–6. Responding to the Commission's statement, "In late January 2002, Showalter and a female friend, whose name he could not recall, took a personal overnight trip to the St. Regis Monarch Beach Resort & Spa, a luxury hotel in Dana Point, California, where Showalter incurred $1,900 in personal expenses which he paid for with the IFG check card," Mr. Showalter states that this was a **business expense,** thus justifiably paid for by investor funds in IFG's general account. Pl.'s Submission at 7; Def.'s Submission n. 14; Part III, *supra,* ¶ 4. In short, the court concludes that Mr. Showalter is dishonest, has lied to the court on many occasions, and acts in bad faith.

**2. The Defendant has Failed to Prove Inability to Pay the Judgment or Good Faith Attempts to Comply**

Returning to Mr. Showalter's burden, the court determines that Mr. Showalter has failed to provide anything close to a full and complete sworn accounting for his and IFG's finances, in violation of the June 6 and 18, 2002 orders. Part III, *supra,* ¶¶ 3, 12–16, 19, 21; *see Bankers Alliance Corp.,* 881 F.Supp. at 679. A complete accounting by Mr. Showalter, under oath, with appropriate supporting documentation, is an essential predicate for Mr. Showalter to meet his burden of demonstrating inability to pay. *SEC v. Kenton Capital, Ltd.,* 983 F.Supp. 13, 16 (D.D.C. 1997). Mr. Showalter's self-serving, unsubstantiated testimony that he has no money is insufficient to demonstrate inability to pay. Part III, *supra,* ¶¶ 12–16, 21.

Finally, because he has not provided a proper accounting, the court cannot determine whether he is able to comply, either in full or in part, with the court's judgment. *Id.*

As for good faith, Mr. Showalter has not established that he has made, in good faith, all reasonable efforts to comply with the court's Final Judgment. He paid no part of the judgment during the time period when he received substantial amounts of cash, including a salary of at least $8,000–$10,000 per month in 2002, and lived extravagantly. Part III, *supra*, ¶¶ 3–6, 19, 20. Despite his lavish lifestyle, the defendant expects the court to trust his statement that $1,950 is, in good faith, the most he can afford to pay on the judgment. Def.'s Submission at 11; Def.'s Prop. Findings ¶ 114. Ironically, this amount is only $450 more than the $1,500 he gave to Ms. Braime shortly after speaking to Ocwen bank about the judgment, and it is a mere $50 more than he paid for a brief visit to the St. Regis Monarch Beach Resort. Part III, *supra*, ¶ 4, 23. When evaluated in light of facts currently before the court, Mr. Showalter's small payment of $1,950 after the show cause hearing does not demonstrate good faith. *Wellington Precious Metals,* 950 F.2d at 1529.

Further evidence of a lack of good faith is Mr. Showalter's sworn statement that he reviewed all information provided with the accountings and found them to be accurate. Part III, *supra*, ¶ 16. Then, when the Commission challenged the accuracy of the accounting at the asset deposition, Mr. Showalter stated that he had not actually reviewed the information. *Id.* The fact that Mr. Showalter swore that he had reviewed the documents in question when he had not, and then deflected blame for the accounting's shortcomings by asserting that he never reviewed the documents, clearly demonstrates his cavalier attitude toward these proceedings and to the truth. *Id.* Significantly, to date, Mr. Showalter has failed to provide an adequate sworn accounting, as ordered by the court. *Id.* ¶¶ 3, 12–16, 19, 20–21.

Finally, in his order to show cause hearing testimony and his July 16, 2002 submission, Mr. Showalter repeatedly asked the court to adopt his payment schedule and agreed to abide by it. Def.'s Submission at 14–15, n. 15–16; Def.'s Show Cause Hrg. Ex. 24. Though the court has not adopted this schedule, the court informed Mr. Showalter that he need not wait for a schedule to make payments on the overdue judgment. As Mr. Showalter has since made numerous payments totaling $1,950, he clearly understands that his payments assist in demonstrating good faith. Ross, Dixon & Bell letter dated Aug. 29, 2002. Mr. Showalter's proposed payment plan specifies $25,000 as the payment for August 2002. Def.'s Show Cause Hrg. Ex. 24. The court saw no such payment in August 2002.

Accordingly, for all the reasons stated above, the court determines that Mr. Showalter has acted in bad faith, has failed to purge himself of the civil contempt finding, and thus the court orders additional sanctions in an effort to motivate Mr. Showalter to demonstrate good faith and to comply with the court's Final Judgment and subsequent orders. *Bankers Alliance Corp.,* 881 F.Supp. at 678. The parties shall submit, to the court, proposals detailing the behavior that they believe should suffice for Mr. Showalter to purge himself of the civil contempt finding. *Petties,* 897 F.Supp. at 629–30. Of course, payment of the judgment in full would purge the contempt finding immediately.

## V. CONCLUSION

In sum, the court rules that Mr. Showalter has failed to purge the court's earlier

civil contempt ruling and, therefore, remains in civil contempt of court. An order directing the parties in a manner consistent with this Memorandum Opinion is separately and contemporaneously issued this 12th day of September 2002.

## ORDER

### HOLDING THE DEFENDANT IN CIVIL CONTEMPT AND IMPOSING SANCTIONS

For the reasons stated in this court's Memorandum Opinion separately and contemporaneously issued this 12th day of September 2002, it is

**ORDERED** that the defendant remains in civil contempt of this court's May 15, 2001 Final Judgment; and it is

**FURTHER ORDERED** that the court imposes the sanction of imprisonment until Mr. Showalter purges himself of the contempt ruling; and it is

**ORDERED** that the Mr. Showalter can purge himself of the contempt ruling immediately by paying the judgment in full. Alternatively, the defendant may file a proposal for how Mr. Showalter can purge his contempt by September 16, 2002. The Commission's counterproposal and response is due by September 23, 2002 at 11:00 a.m. The court will have a hearing on this matter on September 26, 2002 at 10:00 a.m.; and it is

**FURTHER ORDERED** that the Commission submit a memorandum, limited to 8 pages, to the court by September 25, 2002 regarding whether Mr. Showalter should be found in criminal contempt for failing to follow the court's June 6, 2002 and June 18, 2002 orders that he provide a sworn accounting to the Commission by June 20, 2002. Mr. Showalter may file a response to this memorandum, limited to 8 pages, by October 2, 2002; and it is

**ORDERED** that Mr. Showalter shall deliver to the Commission within 15 business days of the entry of this order, by personal delivery, courier, facsimile or overnight mail,

(A) a sworn accounting for Edward R. Showalter by completing, signing and having notarized the United States Securities and Exchange Commission Statement of Financial Condition of Edward R. Showalter, in the form attached to the Court's June 18, 2002 Order; and

(B) a sworn accounting for International Financial Group, Inc. and IFG Goldstar Cement Company by completing, signing and having notarized the United States Securities and Exchange Commission Statement of Financial Condition of International Financial Group, Inc. and IFG Goldstar Cement Company, in the form attached to the Court's June 18, 2002 Order. The sworn accountings required herein shall be typed and complete, shall attach all supporting documentation as required by the forms, all documentation attached to the forms shall be Bates numbered and shall clearly identify the form and question to which the documentation relates; and it is

**FURTHER ORDERED** that the Commission may file a response to Mr. Showalter's sworn accountings no later than two weeks after the Commission receives them; and it is

**ORDERED** that within 10 business days of the entry of this order, Wells Fargo Bank shall pay the remaining balance from the account of Edward R. Showalter, account nos. 873 8656225 and 874 3112297, into the Registry of Court by check payable to "Clerk, United States District Court for the District of Columbia" and delivered to the Clerk of the Court, United States District Court for the District of Columbia, 333 Constitution Avenue, N.W., Washington, D.C. 20001. The

check shall bear on its face the caption "Securities and Exchange Commission v. Edward R. Showalter" and be transmitted to the Clerk under cover of a letter that identifies Edward R. Showalter, the caption and case number of this action, and the name of this court. Copies of the cover letter and payment shall be sent to Mark A. Adler, Assistant Chief Litigation Counsel, 450 Fifth Street, N.W., Washington, D.C. 20549–0911; and it is

**FURTHER ORDERED** that within 10 business days of the entry of this order, First National Bank of Marin shall pay the remaining funds held as collateral for the credit card account of Edward R. Showalter, account no. 031134621, after deducting any balance owed by Edward R. Showalter on his credit card, into the Registry of Court by check payable to "Clerk, United States District Court for the District of Columbia" and delivered to the Clerk of the Court, United States District Court for the District of Columbia, 333 Constitution Avenue, N.W., Washington, D.C. 20001. The check shall bear on its face the caption "Securities and Exchange Commission v. Edward R. Showalter" and be transmitted to the Clerk under cover of a letter that identifies Edward R. Showalter, the caption and case number of this action, and the name of this court. Copies of the cover letter and payment shall be sent to Mark A. Adler, Assistant Chief Litigation Counsel, 450 Fifth Street, N.W., Washington, D.C. 20549–0911; and it is

**ORDERED** that until Mr. Showalter provides the sworn accountings, as described above, and the court determines whether a different payment plan is appropriate, Mr. Showalter shall pay $5,000 on the first of each month into the Registry of Court by cashier's check, certified check, or U.S. postal money order payable to "Clerk, United States District Court for the District of Columbia" and delivered to the Clerk of the Court, United States District Court for the District of Columbia, 333 Constitution Avenue, N.W., Washington, D.C. 20001. The check shall bear on its face the caption "Securities and Exchange Commission v. Edward R. Showalter" and be transmitted to the Clerk under cover of a letter that identifies Edward R. Showalter, the caption and case number of this action, and the name of this Court. Copies of the cover letter and payment shall be sent to Mark A. Adler, Assistant Chief Litigation Counsel, 450 Fifth Street, N.W., Washington, D.C. 20549–0911.

**SO ORDERED.**